## NORMAN *v.* BALTIMORE & OHIO RAILROAD CO.*

## UNITED STATES ET AL. *v.* BANKERS TRUST CO. ET AL., TRUSTEES.

Nos. 270, 471 and 472.   Argued January 8, 9, 10, 1935.—Decided February 18, 1935.

---

* No. 270, *Norman* v. *Baltimore & Ohio R. Co.;* Nos. 471 and 472, *United States* v. *Bankers Trust Co.;* No. 531, *Nortz* v. *United States, post,* p. 317; and No. 532, *Perry* v. *United States, post,* p. 330, popularly called the " Gold Clause Cases," were disposed of in three opinions (*post,* pp. 291, 323, and 346).   Mr. Justice Stone filed a concurring opinion in the *Perry* case, *post,* p. 358.   The dissenting opinion, *post,* p. 361, applies to all of the cases.

242

*Mr. Emanuel Redfield* for Norman, petitioner. *Mr.*
*Dalton Dwyer* was with him on the brief, from which the
following summary is extracted:

244

246

*Mr. Frederick H. Wood* for the Baltimore & Ohio R. Co. From the brief:

250

252

254

258

266

268

*Mr. Stanley Reed* made the oral arguments for the Reconstruction Finance Corporation.

274

276

278

*Mr. Edward J. White* for the Trustees of the Missouri Pacific R. Co., petitioners. Points from brief:

*Messrs. James H. McIntosh* and *Edward W. Bourne,* with whom *Messrs. Clifton P. Williamson* and *Thomas W. White* were on the brief, for Bankers Trust Co. et al., respondents. The following summary is from the brief:

282

284

*Mr. Edwin S. S. Sunderland* filed a brief on behalf of the Guaranty Trust Co. et al., Trustees under the First and Refunding Mortgage of Missouri Pacific R. Co., interveners.

By leave of Court, briefs of *amici curiae* were filed by *Messrs. H. W. O'Melveny, Walter K. Tuller,* and *Louis W. Myers,* and by *Mr. Paul Bakewell, Jr.,* in support of the proposition that the Joint Resolution of June 5, 1933, is unconstitutional and void.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

These cases present the question of the validity of the Joint Resolution of the Congress, of June 5, 1933, with respect to the " gold clauses " of private contracts for the payment of money. 48 Stat. 112.

This Resolution, the text of which is set forth in the margin,[1] declares that " every provision contained in or

---

[1] " JOINT RESOLUTION.

" To assure uniform value to the coins and currencies of the United States.

" Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

" Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

" Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby" is "against public policy." Such provisions in obligations thereafter incurred are prohibited. The Resolution provides that "Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts."

In No. 270, the suit was brought upon a coupon of a bond made by the Baltimore and Ohio Railroad Company under date of February 1, 1930, for the payment of $1,000 on February 1, 1960, and interest from date at the rate

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations.

"Sec. 2. The last sentence of paragraph (1) of subsection (b) of section 43 of the Act entitled 'An Act to relieve the existing national economic emergency by increasing agricultural purchasing power, to raise revenue for extraordinary expenses incurred by reason of such emergency, to provide emergency relief with respect to agricultural indebtedness, to provide for the orderly liquidation of joint-stock land banks, and for other purposes,' approved May 12, 1933, is amended to read as follows:

"'All coins and currencies of the United States (including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations) heretofore or hereafter coined or issued, shall be legal tender for all debts, public and private, public charges, taxes, duties, and dues, except that gold coins, when below the standard weight and limit of tolerance provided by law for the single piece, shall be legal tender only at valuation in proportion to their actual weight.'

"Approved, June 5, 1933, 4:40 p. m."

of 4½ per cent. per annum, payable semi-annually. The bond provided that the payment of principal and interest "will be made . . . in gold coin of the United States of America of or equal to the standard of weight and fineness existing on February 1, 1930." The coupon in suit, for $22.50 was payable on February 1, 1934. The complaint alleged that on February 1, 1930, the standard weight and fineness of a gold dollar of the United States as a unit of value "was fixed to consist of twenty-five and eight-tenths grains of gold, nine-tenths fine," pursuant to the Act of Congress of March 14, 1900 (31 Stat. 45); and that by the Act of Congress known as the "Gold Reserve Act of 1934" (January 30, 1934, 48 Stat. 337), and by the order of the President under that Act, the standard unit of value of a gold dollar of the United States " was fixed to consist of fifteen and five-twenty-firsts grains of gold, nine-tenths fine," from and after January 31, 1934. On presentation of the coupon, defendant refused to pay the amount in gold, or the equivalent of gold in legal tender of the United States which was alleged to be, on February 1, 1934, according to the standard of weight and fineness existing on February 1, 1930, the sum of $38.10, and plaintiff demanded judgment for that amount.

Defendant answered that by Acts of Congress, and, in particular, by the Joint Resolution of June 5, 1933, defendant had been prevented from making payment in gold coin "or otherwise than dollar for dollar, in coin or currency of the United States (other than gold coin and gold certificates)" which at the time of payment constituted legal tender. Plaintiff, challenging the validity of the Joint Resolution under the Fifth and Tenth Amendments, and Article I, § 1, of the Constitution of the United States, moved to strike the defense. The motion was denied. Judgment was entered for plaintiff for $22.50, the face of the coupon, and was affirmed upon appeal. The Court of Appeals of the State considered the federal question and

decided that the Joint Resolution was valid. 265 N. Y. 37; 191 N. E. 726. This Court granted a writ of certiorari, October 8, 1934.

In Nos. 471 and 472, the question arose with respect to an issue of bonds, dated May 1, 1903, of the St. Louis, Iron Mountain & Southern Railway Company, payable May 1, 1933. The bonds severally provided for the payment of " One Thousand Dollars gold coin of the United States of the present standard of weight and fineness," with interest from date at the rate of four per cent. per annum, payable " in like gold coin semi-annually." In 1917, Missouri Pacific Railroad Company acquired the property of the obligor subject to the mortgage securing the bonds. In March, 1933, the United States District Court, Eastern District of Missouri, approved a petition filed by the latter company under § 77 of the Bankruptcy Act. In the following December, the trustees under the mortgage asked leave to intervene, seeking to have the income of the property applied against the mortgage debt and alleging that the debt was payable " in gold coin of the United States of the standard of weight and fineness prevailing on May 1, 1903." Later, the Reconstruction. Finance Corporation and the United States, as creditors of the debtor, filed a joint petition for leave to intervene, in which they denied the validity of the gold clause contained in the mortgage and bonds. Leave to intervene specially was granted to each applicant on April 5, 1934, and answers were filed. On the hearing, the District Court decided that the Joint Resolution of June 5, 1933, was constitutional and that the trustees were entitled, in payment of the principal of each bond, to $1,000 in money constituting legal tender. Decree was entered accordingly and the trustees (respondents here) took two appeals to the United States Circuit Court of Appeals.[2]

---

[2] One appeal was allowed by the District Judge and the other by the Circuit Court of Appeals.

While these appeals were pending, this Court granted writs of certiorari, November 5, 1934.

The Joint Resolution of June 5, 1933, was one of a series of measures relating to the currency. These measures disclose not only the purposes of the Congress but also the situations which existed at the time the Joint Resolution was adopted and when the payments under the "gold clauses" were sought. On March 6, 1933, the President, stating that there had been "heavy and unwarranted withdrawals of gold and currency from our banking institutions for the purpose of hoarding" and "extensive speculative activity abroad in foreign exchange" which had resulted "in severe drains on the Nation's stocks of gold," and reciting the authority conferred by § 5 (b) of the Act of October 6, 1917 (40 Stat. 411), declared "a bank holiday" until March 9, 1933. On the same date, the Secretary of the Treasury, with the President's approval, issued instructions to the Treasurer of the United States to make payments in gold in any form only under license issued by the Secretary.

On March 9, 1933, the Congress passed the Emergency Banking Act. 48 Stat. 1. All orders issued by the President or the Secretary of the Treasury since March 4, 1933, under the authority conferred by § 5 (b) of the Act of October 6, 1917, were confirmed. That section was amended so as to provide that during any period of national emergency declared by the President, he might "investigate, regulate or prohibit," by means of licenses or otherwise, "any transactions in foreign exchange, transfers of credit between or payments by banking institutions as defined by the President, and export, hoarding, melting, or earmarking of gold or silver coin or bullion or currency, by any person within the United States or any place subject to the jurisdiction thereof." The Act also amended § 11 of the Federal Reserve Act (39 Stat. 752) so as to authorize the Secretary of the Treasury to

require all persons to deliver to the Treasurer of the United States " any or all gold coin, gold bullion, and gold certificates " owned by them, and that the Secretary should pay therefor " an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States." By Executive Order of March 10, 1933, the President authorized banks to be reopened, as stated, but prohibited the removal from the United States, or any place subject to its jurisdiction, of " any gold coin, gold bullion, or gold certificates, except in accordance with regulations prescribed by or under license issued by the Secretary of the Treasury." By further Executive Order of April 5, 1933, forbidding hoarding, all persons were required to deliver, on or before May 1, 1933, to stated banks " all gold coin, gold bullion and gold certificates," with certain exceptions, the holder to receive " an equivalent amount of any other form of coin or currency coined or issued under the laws of the United States." Another Order of April 20, 1933, contained further requirements with respect to the acquisition and export of gold and to transactions in foreign exchange.

By § 43 of the Agricultural Adjustment Act of May 12, 1933 (48 Stat. 51), it was provided that the President should have authority, upon the making of prescribed findings and in the circumstances stated, "to fix the weight of the gold dollar in grains nine tenths fine and also to fix the weight of the silver dollar in grains nine tenths fine at a definite fixed ratio in relation to the gold dollar at such amounts as he finds necessary from his investigation to stabilize domestic prices or to protect the foreign commerce against the adverse effect of depreciated foreign currencies," and it was further provided that the "gold dollar, the weight of which is so fixed, shall be the standard unit of value," and that "all forms of money shall be maintained at a parity with this standard," but

that "in no event shall the weight of the gold dollar be fixed so as to reduce its present weight by more than 50 per centum."

Then followed the Joint Resolution of June 5, 1933. There were further Executive Orders of August 28 and 29, 1933, October 25, 1933, and January 12 and 15, 1934, relating to the hoarding and export of gold coin, gold bullion and gold certificates, to the sale and export of gold recovered from natural deposits, and to transactions in foreign exchange, and orders of the Secretary of the Treasury, approved by the President, on December 28, 1933, and January 15, 1934, for the delivery of gold coin, gold bullion and gold certificates to the United States Treasury.

On January 30, 1934, the Congress passed the "Gold Reserve Act of 1934" (48 Stat. 337) which, by § 13, ratified and confirmed all the actions, regulations and orders taken or made by the President and the Secretary of the Treasury under the Act of March 9, 1933, or under § 43 of the Act of May 12, 1933, and, by § 12, with respect to the authority of the President to fix the weight of the gold dollar, provided that it should not be fixed "in any event at more than 60 per centum of its present weight." On January 31, 1934, the President issued his proclamation declaring that he fixed " the weight of the gold dollar to be 15 5/21 grains nine tenths fine," from and after that date.

We have not attempted to summarize all the provisions of these measures. We are not concerned with their wisdom. The question before the Court is one of power, not of policy. And that question touches the validity of these measures at but a single point, that is, in relation to the Joint Resolution denying effect to "gold clauses" in existing contracts. The Resolution must, however, be considered in its legislative setting and in the light of other measures *in pari materia*.

*First. The interpretation of the gold clauses in suit.* In the case of the *Baltimore and Ohio Railroad Company,* the obligor considers the obligation to be one " for the payment of money and not for the delivery of a specified number of grains or ounces of gold"; that it is an obligation payable in money of the United States and not less so because payment is to be made " in a particular kind of money "; that it is not a " commodity contract " which could be discharged by " tender of bullion." At the same time, the obligor contends that, while the Joint Resolution is constitutional in either event, the clause is a " gold coin " and not a " gold value " clause; that is, it does not imply " a payment in the ' equivalent ' of gold in case performance by payment in gold coin is impossible." The parties, runs the argument, intended that the instrument should be negotiable and hence it should not be regarded as one " for the payment of an indeterminate sum ascertainable only at date of payment." And in the reference to the standard of weight and fineness, the words " equal to " are said to be synonymous with " of."

In the case of the bonds of the *St. Louis, Iron Mountain & Southern Railway Company,* the Government urges that by providing for payment in gold coin the parties showed an intention " to protect against depreciation of one kind of money as compared with another, as for example, paper money compared with gold, or silver compared with gold "; and, by providing that the gold coin should be of a particular standard, they attempted " to assure against payment in coin of lesser gold content." The clause, it is said, " does not reveal an intention to protect against a situation where gold coin no longer circulates and all forms of money are maintained in the United States at a parity with each other"; apparently, " the parties did not anticipate the existence of conditions making it impossible and illegal to procure gold coin with which to meet the obligations." In view of that impossibility, asserted to exist both in fact and in law, the

Government contends that "the present debtor would be excused, in an action on the bonds, from the obligation to pay in gold coin," but, "as only one term of the promise in the gold clause is impossible to perform and illegal," the remainder of the obligation should stand and thus the obligation "becomes one to pay the stated number of dollars."

The bondholder in the first case, and the trustees of the mortgage in the second case, oppose such an interpretation of the gold clauses as inadequate and unreasonable. Against the contention that the agreement was to pay in gold coin if that were possible, and not otherwise, they insist that it is beyond dispute that the gold clauses were used for the very purpose of guarding against a depreciated currency. It is pointed out that the words "gold coin of the *present* standard" show that the parties contemplated that when the time came to pay there might be gold dollars of a new standard, and, if so, that "gold coin of the present standard" would pass from circulation; and it is taken to be admitted, by the Government's argument, that if gold coins of a lesser standard were tendered, they would not have to be accepted unless they were tendered in sufficient amount to make up the "gold value" for which, it is said, the contract called. It is insisted that the words of the gold clause clearly show an intent "to establish a measure or standard of value of the money to be paid if the particular kind of money specified in the clause should not be in circulation at the time of payment." To deny the right of the bondholders to the equivalent of the gold coin promised is said to be not a construction of the gold clause but its nullification.[3]

---

[3] As illustrating the use of such clauses as affording a standard or measure of value, counsel refer to Article 262 of the Treaty of Versailles with respect to the monetary obligations of Germany, which were made payable in gold coins of several countries, with the stated

The decisions of this Court relating to clauses for payment in gold did not deal with situations corresponding to those now presented. *Bronson* v. *Rodes,* 7 Wall. 229; *Butler* v. *Horwitz,* 7 Wall. 258; *Dewing* v. *Sears,* 11 Wall. 379; *Trebilcock* v. *Wilson,* 12 Wall. 687; *Thompson* v. *Butler,* 95 U. S. 694; *Gregory* v. *Morris,* 96 U. S. 619. See, also, *The Vaughan and Telegraph,* 14 Wall. 258; *The Emily Souder,* 17 Wall. 666. The rulings, upholding gold clauses and determining their effect, were made when gold was still in circulation and no act of the Congress prohibiting the enforcement of such clauses had been passed. In *Bronson* v. *Rodes, supra,* p. 251, the Court held that the legal tender acts of 1862 and 1863, apart from any question of their constitutionality, had not repealed or modified the laws for the coinage of gold and silver or the statutory provisions which made those coins a legal tender in all payments. It followed, said the Court, that " there were two descriptions of money in use at the time the tender under consideration was made, both authorized by law, and both made legal tender in payments. The statute denomination of both descriptions was dollars; but they were essentially unlike in nature." Accordingly, the contract of the parties for payment in one sort of dollars, which was still in lawful circulation, was sustained. The case of *Trebilcock* v. *Wilson, supra,* was decided shortly after the legal tender acts had been held valid. The Court again concluded (pp. 695, 696) that those acts applied only to debts which were payable

---

purpose that the gold coins mentioned " shall be defined as being of the weight and fineness of gold as enacted by law on January 1, 1914." Reference is also made to the construction of the gold clause in the bonds before the House of Lords in *Feist, appellant, and Société Intercommunale Belge d'Electricité, respondents,* L. R. (1934) A. C. 161, 173, and to the decisions of the Permanent Court of International Justice in the cases of the Serbian and Brazilian loans (Publications of the Permanent Court of International Justice, Series A, Nos. 20/21) where the bonds provided for payment in gold francs.

in money generally, and that there were " according to that decision, two kinds of money, essentially different in their nature, but equally lawful." In that view, said the Court, " contracts payable in either, or for the possession of either, must be equally lawful, and, if lawful, must be equally capable of enforcement."

With respect to the interpretation of the clauses then under consideration, the Court observed, in *Bronson* v. *Rodes, supra,* p. 250, that a contract to pay a certain number of dollars in gold or silver coins was, in legal import, nothing else than an agreement to deliver a certain weight of standard gold, to be ascertained by a count of coins, each of which is certified to contain a definite proportion of that weight." The Court thought that it was not distinguishable, in principle, " from a contract to deliver an equal weight of bullion of equal fineness." That observation was not necessary to the final conclusion. The decision went upon the assumption " that engagements to pay coined dollars may be regarded as ordinary contracts to pay money rather than as contracts to deliver certain weights of standard gold." *Id.* p. 251.

In *Trebilcock* v. *Wilson, supra,* where a note was payable " *in specie,*" the Court said (pp. 694, 695) that the provision did not " assimilate the note to an instrument in which the amount stated is payable in chattels; as, for example, to a contract to pay a specified sum in lumber, or in fruit, or grain "; that the words " *in specie* " were " merely descriptive of the kind of dollars in which the note is payable, there being different kinds in circulation, recognized by law "; that they meant " that the designated number of dollars in the note shall be paid in so many gold or silver dollars of the coinage of the United States." And in *Thompson* v. *Butler, supra,* pp. 696, 697, the Court adverted to the statement made in *Bronson* v. *Rodes,* and concluded that " notwithstanding this, it is a contract to pay money, and none the less so because

it designates for payment one of the two kinds of money which the law has made a legal tender in discharge of money obligations." Compare *Gregory* v. *Morris, supra.*

We are of the opinion that the gold clauses now before us were not contracts for payment in gold coin as a commodity, or in bullion, but were contracts for the payment of money. The bonds were severally for the payment of one thousand dollars. We also think that, fairly construed, these clauses were intended to afford a definite standard or measure of value, and thus to protect against a depreciation of the currency and against the discharge of the obligation by a payment of lesser value than that prescribed. When these contracts were made they were not repugnant to any action of the Congress. In order to determine whether effect may now be given to the intention of the parties in the face of the action taken by the Congress, or the contracts may be satisfied by the payment dollar for dollar, in legal tender, as the Congress has now prescribed, it is necessary to consider (1) the power of the Congress to establish a monetary system and the necessary implications of that power; (2) the power of the Congress to invalidate the provisions of existing contracts which interfere with the exercise of its constitutional authority; and (3) whether the clauses in question do constitute such an interference as to bring them within the range of that power.

*Second. The power of the Congress to establish a monetary system.* It is unnecessary to review the historic controversy as to the extent of this power, or again to go over the ground traversed by the Court in reaching the conclusion that the Congress may make treasury notes legal tender in payment of debts previously contracted, as well as of those subsequently contracted, whether that authority be exercised in course of war or in time of

peace. *Knox* v. *Lee,* 12 Wall. 457; *Juilliard* v. *Greenman,* 110 U. S. 421. We need only consider certain postulates upon which that conclusion rested.

The Constitution grants to the Congress power " To coin money, regulate the value thereof, and of foreign coin." Art. I, § 8, par. 5. But the Court in the legal tender cases did not derive from that express grant alone the full authority of the Congress in relation to the currency. The Court found the source of that authority in all the related powers conferred upon the Congress and appropriate to achieve " the great objects for which the government was framed,"—" a national government, with sovereign powers." *McCulloch* v. *Maryland,* 4 Wheat. 316, 404–407; *Knox* v. *Lee, supra,* pp. 532, 536; *Juilliard* v. *Greenman, supra,* p. 438. The broad and comprehensive national authority over the subjects of revenue, finance and currency is derived from the aggregate of the powers granted to the Congress, embracing the powers to lay and collect taxes, to borrow money, to regulate commerce with foreign nations and among the several States, to coin money, regulate the value thereof, and of foreign coin, and fix the standards of weights and measures, and the added express power " to make all laws which shall be necessary and proper for carrying into execution " the other enumerated powers. *Juilliard* v. *Greenman, supra,* pp. 439, 440.

The Constitution " was designed to provide the same currency, having a uniform legal value in all the States." It was for that reason that the power to regulate the value of money was conferred upon the Federal government, while the same power, as well as the power to emit bills of credit, was withdrawn from the States. The States cannot declare what shall be money, or regulate its value. Whatever power there is over the currency is vested in the Congress. *Knox* v. *Lee, supra,* p. 545. Another postulate of the decision in that case is that the Congress has

power "to enact that the government's promises to pay money shall be, for the time being, equivalent in value to the representative of value determined by the coinage acts, or to multiples thereof." *Id.*, p. 553. Or, as was stated in the *Juilliard* case, *supra*, p. 447, the Congress is empowered "to issue the obligations of the United States in such form, and to impress upon them such qualities as currency for the purchase of merchandise and the payment of debts, as accord with the usage of sovereign governments." The authority to impose requirements of uniformity and parity is an essential feature of this control of the currency. The Congress is authorized to provide "a sound and uniform currency for the country," and to "secure the benefit of it to the people by appropriate legislation." *Veazie Bank* v. *Fenno,* 8 Wall. 533, 549.

Moreover, by virtue of this national power, there attach to the ownership of gold and silver those limitations which public policy may require by reason of their quality as legal tender and as a medium of exchange. *Ling Su Fan* v. *United States,* 218 U. S. 302, 310. Those limitations arise from the fact that the law "gives to such coinage a value which does not attach as a mere consequence of intrinsic value." Their quality as legal tender is attributed by the law, aside from their bullion value. Hence the power to coin money includes the power to forbid mutilation, melting and exportation of gold and silver coin,—"to prevent its outflow from the country of its origin." *Id.*, p. 311.

Dealing with the specific question as to the effect of the legal tender acts upon contracts made before their passage, that is, those for the payment of money generally, the Court, in the legal tender cases, recognized the possible consequences of such enactments in frustrating the expected performance of contracts,—in rendering them "fruitless or partially fruitless." The Court pointed out

that the exercise of the powers of Congress may affect "apparent obligations" of contracts in many ways. The Congress may pass bankruptcy acts. The Congress may declare war, or, even in peace, pass non-intercourse acts, or direct an embargo, which may operate seriously upon existing contracts. And the Court reasoned that if the legal tender acts "were justly chargeable with impairing contract obligations, they would not, for that reason, be forbidden, unless a different rule is to be applied to them from that which has hitherto prevailed in the construction of other powers granted by the fundamental law." The conclusion was that contracts must be understood as having been made in reference to the possible exercise of the rightful authority of the Government, and that no obligation of a contract "can extend to the defeat" of that authority. *Knox* v. *Lee, supra,* pp. 549–551.

On similar grounds, the Court dismissed the contention under the Fifth Amendment forbidding the taking of private property for public use without just compensation or the deprivation of it without due process of law. That provision, said the Court, referred only to a direct appropriation. A new tariff, an embargo, or a war, might bring upon individuals great losses; might, indeed, render valuable property almost valueless,—might destroy the worth of contracts. "But whoever supposed" asked the Court, "that, because of this, a tariff could not be changed or a non-intercourse act, or embargo be enacted, or a war be declared." The Court referred to the Act of June 28, 1834, by which a new regulation of the weight and value of gold coin was adopted, and about six per cent. was taken from the weight of each dollar. The effect of the measure was that all creditors were subjected to a corresponding loss, as the debts then due "became solvable with six per cent. less gold than was required to pay them before." But it had never been imagined that there was a taking of private property without compensation or without due

process of law. The harshness of such legislation, or the hardship it may cause, afforded no reason for considering it to be unconstitutional. *Id.,* pp. 551, 552.

The question of the validity of the Joint Resolution of June 5, 1933, must be determined in the light of these settled principles.

*Third. The power of the Congress to invalidate the provisions of existing contracts which interfere with the exercise of its constitutional authority.* The instant cases involve contracts between private parties, but the question necessarily relates as well to the contracts or obligations of States and municipalities, or of their political subdivisions, that is, to such engagements as are within the reach of the applicable national power. The Government's own contracts—the obligations of the United States—are in a distinct category and demand separate consideration. See *Perry* v. *United States,* decided this day, *post,* p. 330.

The contention is that the power of the Congress, broadly sustained by the decisions we have cited in relation to private contracts for the payment of money generally, does not extend to the striking down of express contracts for gold payments. The acts before the Court in the legal tender cases, as we have seen, were not deemed to go so far. Those acts left in circulation two kinds of money, both lawful and available, and contracts for payments in gold, one of these kinds, were not disturbed. The Court did not decide that the Congress did not have the constitutional power to invalidate existing contracts of that sort, if they stood in the way of the execution of the policy of the Congress in relation to the currency. Mr. Justice Bradley, in his concurring opinion, expressed the view that the Congress had that power and had exercised it. *Knox* v. *Lee, supra,* pp. 566, 567. And, upon that ground, he dissented from the opinion of the Court in *Trebilcock* v. *Wilson, supra,* p. 699, as to the

validity of contracts for payment "*in specie*."[4] It is significant that Mr. Justice Bradley, referring to this difference of opinion in the legal tender cases, remarked (in his concurring opinion) that "of course" the difference arose "from the different construction given to the legal tender acts." "I do not understand," he said, "the majority of the court to decide that an act so drawn as to embrace, in terms, contracts payable in specie, would not be constitutional. Such a decision would completely nullify the power claimed for the government. For it would be very easy, by the use of one or two additional words, to make all contracts payable in specie."

Here, the Congress has enacted an express interdiction. The argument against it does not rest upon the mere fact that the legislation may cause hardship or loss. Creditors who have not stipulated for gold payments may suffer equal hardship or loss with creditors who have so stipulated. The former, admittedly, have no constitutional grievance. And, while the latter may not suffer more, the point is pressed that their express stipulations for gold payments constitute property, and that creditors who have not such stipulations are without that property right. And the contestants urge that the Congress is seeking not to regulate the currency, but to regulate contracts, and thus has stepped beyond the power conferred.

This argument is in the teeth of another established principle. Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of the Con-

---

[4] Mr. Justice Miller also dissented in *Trebilcock* v. *Wilson*, 12 Wall., pp. 699, 700, upon the ground "that a contract for gold dollars, in terms, was in no respect different, in legal effect, from a contract for dollars without the qualifying words, specie, or gold, and that the legal tender statutes had, therefore, the same effect in both cases."

gress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them. See *Hudson Water Co.* v. *McCarter,* 209 U. S. 349, 357.

This principle has familiar illustration in the exercise of the power to regulate commerce. If shippers and carriers stipulate for specified rates, although the rates may be lawful when the contracts are made, if Congress through the Interstate Commerce Commission exercises its authority and prescribes different rates, the latter control and override inconsistent stipulations in contracts previously made.. This is so, even if the contract be a charter granted by a State and limiting rates, or a contract between municipalities and carriers. *New York* v. *United States,* 257 U. S. 591, 600, 601; *United States* v. *Village of Hubbard,* 266 U. S. 474, 477, *note.* See, also, *Armour Packing Co.* v. *United States,* 209 U. S. 56, 80–82; *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372, 375.

In *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 229, 230, the Court raised the pertinent question,— if certain kinds of private contracts directly limit or restrain, and hence regulate, interstate commerce, why should not the power of Congress reach such contracts equally with legislation of a State to the same effect? "What sound reason," said the Court, "can be given why Congress should have the power to interfere in the case of the State, and yet have none in the case of the individual? Commerce is the important subject of consideration, and anything which directly obstructs and thus regulates that commerce which is carried on among the States, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce."

Applying that principle, the Court held that a contract, valid when made (in 1871) for the giving of a free pass by an interstate carrier, in consideration of a release of a claim for damages, could not be enforced after the Congress had passed the Act of June 29, 1906, 34 Stat. 584. *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467.[5] Quoting the statement of the general principle in the legal tender cases, the Court decided that the agreement must necessarily be regarded as having been made subject to the possibility that, at some future time, the Congress " might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value." The Court considered it inconceivable that the exercise of such power " may be hampered or restricted to any extent by contracts previously made between individuals or corporations." " The framers of the Constitution never intended any such state of things to exist." *Id.,* p. 482. Accordingly, it has been " authoritatively settled " by decisions of this Court that no previous contracts or combinations can prevent the application of the Anti-Trust Acts to compel the discontinuance of combinations declared to be illegal. *Addyston Pipe & Steel Co.* v. *United States, supra; United States* v. *Southern Pacific Co.,* 259 U. S. 214, 234, 235. See, also, *Calhoun* v. *Massie,* 253 U. S. 170, 176; *Omnia Commercial Co.* v. *United States,* 261 U. S. 502, 509; *Stephenson* v. *Binford,* 287 U. S. 251, 276.

The principle is not limited to the incidental effect of the exercise by the Congress of its constitutional authority. There is no constitutional ground for denying to the Congress the power expressly to prohibit and invalidate contracts although previously made, and valid when made,

---

[5] Compare *New York Central & Hudson R. R. Co.* v. *Gray,* 239 U. S. 583; *Calhoun* v. *Massie,* 253 U. S. 170, 176.

when they interfere with the carrying out of the policy it is free to adopt. The exercise of this power is illustrated by the provision of § 5 of the Employers' Liability Act of 1908 (35 Stat. 65, 66) relating to any contract the purpose of which was to enable a common carrier to exempt itself from the liability which the Act created. Such a stipulation the Act explicitly declared to be void. In the *Second Employers' Liability Cases,* 223 U. S. 1, 52, the Court decided that as the Congress possessed the power to impose the liability, it also possessed the power "to insure its efficacy by prohibiting any contract, rule, regulation or device in evasion of it." And this prohibition the Court has held to be applicable to contracts made before the Act was passed. *Philadelphia, B. & W. R. Co.* v. *Schubert,* 224 U. S. 603. In that case, the employee, suing under the Act, was a member of the "Relief Fund" of the railroad company under a contract of membership, made in 1905, for the purpose of securing certain benefits. The contract provided that an acceptance of those benefits should operate as a release of claims, and the company pleaded that acceptance as a bar to the action. The Court held that the Employers' Liability Act supplied the governing rule and that the defense could not be sustained. The power of the Congress in regulating interstate commerce was not fettered by the necessity of maintaining existing arrangements and stipulations which would conflict with the execution of its policy. The reason is manifest. To subordinate the exercise of the Federal authority to the continuing operation of previous contracts would be to place to this extent the regulation of interstate commerce in the hands of private individuals and to withdraw from the control of the Congress so much of the field as they might choose by " prophetic discernment " to bring within the range of their agreements. The Constitution recognizes no such limitation. *Id.,* pp. 613, 614. See,

also, *United States* v. *Southern Pacific Co., supra; Sproles* v. *Binford,* 286 U. S. 374, 390, 391; *Radio Commission* v. *Nelson Brothers Co.* 289 U. S. 266, 282.

The same reasoning applies to the constitutional authority of the Congress to regulate the currency and to establish the monetary system of the country. If the gold clauses now before us interfere with the policy of the Congress in the exercise of that authority they cannot stand.

*Fourth. The effect of the gold clauses in suit in relation to the monetary policy adopted by the Congress.* Despite the wide range of the discussion at the bar and the earnestness with which the arguments against the validity of the Joint Resolution have been pressed, these contentions necessarily are brought, under the dominant principles to which we have referred, to a single and narrow point. That point is whether the gold clauses do constitute an actual interference with the monetary policy of the Congress in the light of its broad power to determine that policy. Whether they may be deemed to be such an interference depends upon an appraisement of economic conditions and upon determinations of questions of fact. With respect to those conditions and determinations, the Congress is entitled to its own judgment. We may inquire whether its action is arbitrary or capricious, that is, whether it has reasonable relation to a legitimate end. If it is an appropriate means to such an end, the decisions of the Congress as to the degree of the necessity for the adoption of that means, is final. *McCulloch* v. *Maryland, supra,* pp. 421, 423; *Juilliard* v. *Greenman, supra,* p. 450; *Stafford* v. *Wallace,* 258 U. S. 495, 521; *Everard's Breweries* v. *Day,* 265 U. S. 545, 559, 562.

The Committee on Banking and Currency of the House of Representatives stated in its report recommending

favorable action upon the Joint Resolution (H. R. Rep. No. 169, 73d Cong., 1st Sess.):

" The occasion for the declaration in the resolution that the gold clauses are contrary to public policy arises out of the experiences of the present emergency. These gold clauses render ineffective the power of the Government to create a currency and determine the value thereof. If the gold clause applied to a very limited number of contracts and security issues, it would be a matter of no particular consequence, but in this country virtually all obligations, almost as a matter of routine, contain the gold clause. In the light of this situation two phenomena which have developed during the present emergency make the enforcement of the gold clauses incompatible with the public interest. The first is the tendency which has developed internally to hoard gold; the second is the tendency for capital to leave the country. Under these circumstances no currency system, whether based upon gold or upon any other foundation, can meet the requirements of a situation in which many billions of dollars of securities are expressed in a particular form of the circulating medium, particularly when it is the medium upon which the entire credit and currency structure rests."

And the Joint Resolution itself recites the determination of the Congress in these words: [6]

" Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the

---

[6] See Note 1.

declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts."

Can we say that this determination is so destitute of basis that the interdiction of the gold clauses must be deemed to be without any reasonable relation to the monetary policy adopted by the Congress?

The Congress in the exercise of its discretion was entitled to consider the volume of obligations with gold clauses, as that fact, as the report of the House Committee observed, obviously had a bearing upon the question whether their existence constituted a substantial obstruction to the congressional policy. The estimates submitted at the bar indicate that when the Joint Resolution was adopted there were outstanding seventy-five billion dollars or more of such obligations, the annual interest charges on which probably amounted to between three and four billion dollars. It is apparent that if these promises were to be taken literally, as calling for actual payment in gold coin, they would be directly opposed to the policy of Congress, as they would be calculated to increase the demand for gold, to encourage hoarding, and to stimulate attempts at exportation of gold coin. If there were no outstanding obligations with gold clauses, we suppose that no one would question the power of the Congress, in its control of the monetary system, to endeavor to conserve the gold resources of the Treasury, to insure its command of gold in order to protect and increase its reserves, and to prohibit the exportation of gold coin or its use for any purpose inconsistent with the needs of the Treasury. See *Ling Su Fan* v. *United States, supra.* And if the Congress would have that power in the absence of gold clauses, principles beyond dispute compel the conclusion that private parties, or States or municipalities,

by making such contracts could not prevent or embarrass its exercise. In that view of the import of the gold clauses, their obstructive character is clear.

But, if the clauses are treated as "gold value" clauses, that is, as intended to set up a measure or standard of value if gold coin is not available, we think they are still hostile to the policy of the Congress and hence subject to prohibition. It is true that when the Joint Resolution was adopted on June 5, 1933, while gold coin had largely been withdrawn from circulation and the Treasury had declared that " gold is not now paid, nor is it available for payment, upon public or private debts," [7] the dollar had not yet been devalued. But devaluation was in prospect and a uniform currency was intended.[8]  Section 43 of the Act of May 12, 1933 (48 Stat. 51), provided that the President should have authority, on certain conditions, to fix the weight of the gold dollar as stated, and that its weight as so fixed should be " the standard unit of value " with which all forms of money should be maintained " at a parity." The weight of the gold dollar was not to be reduced by more than 50 per centum. The Gold Reserve Act of 1934 (January 30, 1934, 48 Stat. 337), provided that the President should not fix the weight of

[7] Treasury Statement of May 26, 1933.

[8] The Senate Committee on Banking and Currency, in its Report of May 27, 1933, stated: " By the Emergency Banking Act and the existing Executive Orders gold is not now paid, or obtainable for payment, on obligations public or private. By the Thomas amendment currency was intended to be made legal tender for all debts. However, due to the language used doubt has arisen whether it has been made legal tender for payments on gold clause obligations, public and private. This doubt should be removed. These gold clauses interfere with the power of Congress to regulate the value of the money of the United States and the enforcement of them would be inconsistent with existing legislative policy." Sen. Rep. No. 99, 73d Cong., 1st sess.

the gold dollar at more than 60 per cent. of its present weight. The order of the President of January 31, 1934, fixed the weight of the gold dollar at 15 5/21 grains nine-tenths fine as against the former standard of 25 8/10 grains nine-tenths fine. If the gold clauses interfered with the congressional policy and hence could be invalidated, there appears to be no constitutional objection to that action by the Congress in anticipation of the determination of the value of the currency. And the questions now before us must be determined in the light of that action.

The devaluation of the dollar placed the domestic economy upon a new basis. In the currency as thus provided, States and municipalities must receive their taxes; railroads, their rates and fares; public utilities, their charges for services. The income out of which they must meet their obligations is determined by the new standard. Yet, according to the contentions before us, while that income is thus controlled by law, their indebtedness on their "gold bonds" must be met by an amount of currency determined by the former gold standard. Their receipts, in this view, would be fixed on one basis; their interest charges, and the principal of their obligations, on another. It is common knowledge that the bonds issued by these obligors have generally contained gold clauses, and presumably they account for a large part of the outstanding obligations of that sort. It is also common knowledge that a similar situation exists with respect to numerous industrial corporations that have issued their "gold bonds" and must now receive payments for their products in the existing currency. It requires no acute analysis or profound economic inquiry to disclose the dislocation of the domestic economy which would be caused by such a disparity of conditions in which, it is insisted, those debtors under gold clauses should be required to pay one

dollar and sixty-nine cents in currency while respectively receiving their taxes, rates, charges and prices on the basis of one dollar of that currency.

We are not concerned with consequences, in the sense that consequences, however serious, may excuse an invasion of constitutional right. We are concerned with the constitutional power of the Congress over the monetary system of the country and its attempted frustration. Exercising that power, the Congress has undertaken to establish a uniform currency, and parity between kinds of currency, and to make that currency, dollar for dollar, legal tender for the payment of debts. In the light of abundant experience, the Congress was entitled to choose such a uniform monetary system, and to reject a dual system, with respect to all obligations within the range of the exercise of its constitutional authority. The contention that these gold clauses are valid contracts and cannot be struck down proceeds upon the assumption that private parties, and States and municipalities, may make and enforce contracts which may limit that authority. Dismissing that untenable assumption, the facts must be faced. We think that it is clearly shown that these clauses interefere with the exertion of the power granted to the Congress and certainly it is not established that the Congress arbitrarily or capriciously decided that such an interference existed.

The judgment and decree, severally under review, are affirmed.

> *No. 270. Judgment affirmed.*
> *Nos. 471 and 472. Decree affirmed.*

Mr. Justice McReynolds, Mr. Justice Van Devanter, Mr. Justice Sutherland, and Mr. Justice Butler dissent. See *post,* p. 361.