### BRUIN et v LEVELINE et

Ohio Appeals, 2nd Dist, Butler Co

Decided Oct 26, 1936

Walter S. Harlan, Hamilton, for appellees.

Williams, Sohngen, Fitton & Pearce, Hamilton, and James White Shocknessy, for appellant.

## OPINION

By MATTHEWS, J.

This is an appeal on questions of law from the Probate Court of Butler County.

The only questions presented are the construction and the constitutionality of §10510-46, GC, effective September 2, 1935, as applied to a mortgage executed prior thereto.

The record shows that Linda Boutcher and James W. Boutcher were tenants in common of certain real estate. On December 9, 1933, they executed a mortgage to Home Owners' Loan Corporation to secure a loan by it to them of $2,571.44, with interest at 5% per annum.

Linda Boutcher died on November 10, 1935, and James W. Boutcher died on November 20, 1935. Prior to the death of Linda Boutcher the mortgagors had failed to pay installments in accordance with the covenants of the mortgage. They continued in default at all times thereafter and thereby the condition of the mortgage was broken.

Administration proceedings were commenced on both estates, and on February 19, 1936, each personal representative instituted an action to sell his decedent's interest in this real estate to pay debts. Home Owners' Loan Corporation and those upon whom the title devolved upon the mortgagor's death were named as defendants in each case. Home Owners' Loan Corporation filed an answer alleging its mortgage lien, and prayed that if the property was sold its lien be determined and paid out of the proceeds of sale.

By consent, the actions were consolidated, the necessary proceedings taken, and the property offered for sale. The mortgagee was the highest bidder and the court confirmed the sale to it and directed the personal representatives to convey the title to it upon payment of the purchase price.

The sale price was less than the amount of the mortgage debt due to Home Owners' Loan Corporation.

In the order of distribution the court ordered the personal representative in each case to pay to himself the sum of $50 "as compensation for his services in connection with the sale," and to pay the attorney for the personal representatives the total sum of $250 "for legal services performed for" said personal representative "in connection with said sale." The balance of the proceeds of sale after payment of taxes and court costs "in connection with the sale" was ordered paid to Home Owners' Loan Corporation to be applied on the indebtedness to it.

The controversy arises over the allowance of compensation to the personal representatives and their attorney. Home Owners' Loan Corporation claims that there is no warrant in law for the payment of such fees out of the proceeds of sale in view of the fact that it was the purchaser for less than the amount of the debt due it.

No bill of exceptions was filed and there is nothing in the record from which this court could determine the nature and extent of the services. We must, therefore, assume in passing upon this case that the services were reasonably worth the amount awarded by the court, and that such services redounded to the benefit of Home Owners' Loan Corporation, as the event of the sale demonstrated that such services could accrue to the advantage of no one else; and in any event it would have been obliged to pursue some comparable proceeding to secure payment of its debt and perfect its title to the real estate.

It is not necessary to consider the exact nature of the title of a mortgagee after condition broken. It is clear that such title is not perfect. The mortgagor still has an equity, at least, of which he can be deprived without his consent only by judicial decree or lapse of time.

Nor will it advance the solution of the problem before us to consider the cases construing statutes that were in force prior to that construed in **State ex Fulton v**

Griffith, 127 Oh St 161, 187 NE 121, which was the statute in force at the time this mortgage was executed. In that case the court held:

"1. Under the provisions of §10510-46, GC, the commission for the service of an executor or administrator in the sale of real estate, and attorney fees for services performed for such fiduciary therein, may be computed only upon and paid out of the money arising from the sale of such real estate.

"2. Where a mortgagee purchases the property for less than the sum found due on his mortgage, the Probate Court is not authorized to tax, as a part of the costs of sale, either a commission for the fiduciary or a fee for his attorney (Stone v Strong, 42 Oh St 53, approved and followed)."

The statute under consideration in that case was §10510-46, GC, effective January 1, 1932. Only its meaning and not its constitutionality was involved in the case.

The opinion in State ex Fulton v Griffith, supra, was handed down on May 31, 1933, and an application for a rehearing was denied on September 26, 1933.

At its next regular session the Legislature repealed §10510-46, GC, construed in State ex Fulton v Griffith, supra, on May 14, 1935, and passed §10510-46, GC, in the form it was at the time the actions to sell to pay debts were instituted and the decree of distribution made. As modified, and re-enacted, §10510-46, GC, so far as material here, providing for the order in which the proceeds of sale should be distributed in a proceeding to sell real estate to pay debts, is as follows:

"1. To discharge the costs and expenses of the sale, including reasonable fees to be fixed by the court for services performed by attorneys for the fiduciary in connection with the sale, and * * * such compensation, if any, to the fiduciary for his services in connection with the sale as the court may deem warranted and fix, which costs, expenses, fees and compensation shall be paid prior to any liens upon the real estate sold and notwithstanding the purchase of such real estate by a lien holder.

"2. To the payment of taxes, penalties, and assessments then due, against such real estate and to the payment of mortgages and judgments against the ward or deceased person, according to their respective priorities of lien, so far as they operated as a lien on the real estate of the deceased

at the time of the sale or on the estate of the ward at the time of the sale; which shall be apportioned and determined by the court, or on reference to a master or otherwise."

The emphasized parts indicate the modification.

The language used, considering the circumstances under which the modification was made, is so clear that interpretation is unnecessary. The Legislature clearly intended to authorize the payment of compensation to personal representatives and their attorneys for services █ in connection with sales in proceedings to sell to pay debts, and to make the payment of such compensation out of the sale price prior and preferable to any liens upon the real estate sold, and notwithstanding the purchase of such real estate by a lienholder. That is what the Legislature enacted. Paraphrasing it could not add to its clarity. It is claimed, however, that it was beyond its power to make this enactment applicable to liens existing at the time of the enactment. That brings us to the constitutional question.

It is urged that to apply this law to this mortgage executed prior to the passage of the statute would impair the █ obligation of the contract and deprive the mortgagee of a vested right without due process of law, in violation of federal and state constitutional provisions. As no vested right is disturbed unless the obligation of the contract is impaired, the real question is whether the application of the statute in this case has the effect of impairing contractual obligations.

The meaning of the constitutional provision prohibiting legislation impairing the obligation of contract, §10 of Article I of the United States Constitution, has been so recently and profoundly discussed in the case of Home Building & Loan Association v Blaisdell, 290 U. S. 393, 54 S. Ct. 231, 78 L. Ed. 413, 88 A.L.R. 1481, relating to the Minnesota Mortgage Moratorium Act, that no general discussion is either necessary or appropriate. Chief Justice Hughes in that case at page 428:

"To ascertain the scope of the constitutional prohibition we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to

be read with literal exactness like a mathematical formula."

And at pages 434 and 435 it is said:

"Not only is the constitutional provision qualified by the measure of control which the state retains over remedial processes, but the state also continues to possess authority to safeguard the vital interests of its people. It does not matter that legislation appropriate to that end 'has the result of modifying or abrogating contracts already in effect.' Stephenson v Binford, 287 U. S. 251, 276. Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this court."

Further, at pages 438 and 439:

"The argument is pressed that in the cases we have cited the obligation of contracts was affected only incidentally. This argument proceeds upon a misconception. The question is not whether the legislative action affects contracts incidentally, or directly or indirectly, but whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end. Another argument, which comes more closely to the point, is that the state power may be addressed directly to the prevention of the enforcement of contracts only when these are of a sort which the legislature in its discretion may denounce as being in themselves hostile to public morals, or public health, safety or welfare, or where the prohibition is merely of injurious practices; that interference with the enforcement of other and valid contracts according to appropriate legal procedure, although the interference is temporary and for a public purpose is not permissible. This is but to contend that in the latter case the end is not legitimate in the view that it cannot be reconciled with a fair interpretation of the constitutional provision."

So in that case it was held that the state Legislature had the power to change the law relating to foreclosure of mortgages by increasing the period of redemption on terms which the court said it could not say were unfair to the mortgagee, and that this law could be made applicable to existing mortgages notwithstanding the constitutional provision prohibiting state laws impairing the obligation of contract and the deprivation of property without due process of law to be found in the 14th Amendment to the United States Constitution. As is seen from the quotation, the court placed its decision upon two grounds, the so-called police power, and the power to provide and change the remedy for the enforcement of rights.

In Norman v Baltimore & Ohio Rd. Co., 294 U. S. 240, 55 S. Ct. 407, 79 L. Ed. 885, 95 A.L.R. 1352, the court held that the power of government over the monetary system could not be limited by the covenants in private contract.

Many cases could be cited illustrating the supremacy of the power of government over persons and property notwithstanding the constitutional guaranties of life, liberty and property, and the prohibition against laws impairing the obligation of contracts. When the exercise of this power to govern relates directly to the safety, health or morals of the people it is almost invariably characterized as an exercise of the police power. When it has to do with the general welfare or general prosperity, it is frequently referred to as an exercise of the police power, but not always. Miller v Schoene, 276 U. S. 272, 48 S. Ct. 246, 72 L. Ed. 568. Many instances of the exercise of governmental power have been sustained against challenge on the ground that they were proper exercises of governmental power without any special attempt to classify them with other instances; and in instances that could not be classified, as in the case of Norman v Baltimore & Ohio Rd. Co., supra, and in other instances of exercise of power by the federal government. The phrase "police power" has become a convenient expression to indicate that reserved power of government in the states, notwithstanding the due process clause of the 14th Amendment. While this reserved power is usually exercised in matters pertaining to safety, health and morals, it includes the power to legislate to accomplish any just object of government by appropriate legislation not specifically prohibited.

The net result of the cases is that all persons and property, including contracts, are subservient to the rightful exercise of sovereign power. It is the peculiar func-

tion of government to legislate—to make the laws—and the determination of the need for laws rests primarily with the law-making department. The judicial department will not disturb the legislative finding on that subject unless it can say that such finding is clearly and manifestly wrong.

If the law relates to any just object of government, and the law is non-discriminatory and reasonably calculated to accomplish that object, the courts have no function other than to interpret and apply it, notwithstanding the due process and impairment of contract provisions. Government should concern itself with the safety, health, morals, general welfare and prosperity of the people, and provide laws to control situations where needed, and modify them when it is found that existing laws are causing injustice. Within this ambit legislatures pass laws of inheritance, and prescribe the manner of disposition of property by will, and provide the mode and manner of administering decedent's estates.

Where many people acquire proprietary or contractual interests in the same subject-matter, and laws are necessary that they may enjoy such rights in peace and without encroachment, it is a proper function of government to provide such laws. Commonwealth v Alger, 61 Mass. (7 Cush), 53; Clark v Nash, 198 U. S. 361, 49 L. Ed. 1085, 25 S. Ct. 676.

And if the existing law is such that one person is given the benefit of the services or property of another without compensation, contrary to equity and good conscience, it is a just object of government to so amend the law as to make it conform to equity and good conscience by requiring the recipient of the benefit to pay for it. The Occupying Claimant Law is one such example. McCoy v Grandy, 3 Oh St 463. The Mechanic's Lien Law is another.

When this mortgage was executed the mortgagee knew that this power of government to legislate existed, and that it might be exercised. Its mortgage was subject to this paramount power to govern. It was an implied term in the mortgage itself and therefore its exercise could not be an impairment of the contract.

It knew that by loaning the money and taking a mortgage upon real estate as security it entangled its property rights with those of others. It knew that the title of the mortgagor might be split into undivided shares owned by many persons, and that this condition might result either by voluntary transfer or by operation of law upon the death of the mortgagor.

It knew from the beginning that if its debt was not paid voluntarily, it would have to have recourse to the court to enforce payment, and that its rights might become involved with those of the decedent's other creditors and his heirs, in which event some one would be required to perform services so that the rights of the respective parties could be judicially determined.

It knew at all times that if the mortgagor died leaving insufficient personal property to pay his debts, its only recourse for the payment of its debt would be the mortgaged realty, and that this would be charged with the payment of taxes, constituting a prior lien, and with the mortgagor's debts, which, of course, would be subordinate to the mortgage lien.

All these contingencies must be considered as having been within the contemplation of the parties to this mortgage. They, therefore, contemplated that recourse to a judicial sale of the realty might be necesasry. And they further contemplated that services would be rendered by those effectuating such sale.

It cannot be maintained that the state was obliged to preserve the assumed pristine integrity of the obligation of the contract, dollar for dollar, by providing agencies of enforcement gratuitously, so that the stipulated money value would be realized by the promisee. And, of course, no one would contend that the state is under a duty to underwrite an improvident loan. Nor where the interests of many are involved, as in this sort of a situation, is it obliged to accord a preferential right to one (the mortgagee), to initiate the judicial proceedings to the exclusion of the others. On the contrary, the state may place in the power of the one invoking the remedy the power of selecting the agencies of enforcement of the remedy, to whom will be paid the compensation for so doing. Analogies are not lacking. In bankruptcy proceedings the majority of the unsecured creditors select the trustee who administers the estate. In all instances the agency is under the direction and control of the court, and that gives to the proceeding due process of law. And the value of services depends upon the time and place of their rendition. A legislature conscious of realities will not allow a statutory standard of compensation to remain unamended when it ceases to represent just compensation for com-

parable services under current circumstances.

The proceeding to bring all the interested parties before the court so that the judicial sale would convey a perfect title would necessarily be for the benefit of those owning the property, and when the entire proceeds of sale are awarded to one, it would seem that the proceeding was solely for his benefit.

But it is argued that the sovereign power does not extend to changing the agency, and particularly the compensation of such agencies after contracts have been entered into, and to making such changes applicable to proceedings to enforce such contracts. What we have said, we believe, answers this argument.

However, what has been the course of judicial decisions on the subjct of statutory change of court costs, including attorney fees, as applied to existing contracts?

In Spicer v Benefit Assn. of Ry. Employees, 142 Or. 574, 588, 21 P. (2d) 187, 90 A.L.R. 517, the court upheld the constitutionality of a statute subjecting insurers to the payment of attorney's fees as applied to an insurance policy written before it went into effect. In the annotation in 90 A.L.R. 518, at page 537, it is said:

"It is generally held that the fact that enactments awarding attorneys' fees which are valid exercises of the police power or of the power to prescribe costs operate retrospectively will not render them unconstitutional."

Decisions of the highest courts of ten states are listed in support of the annotation, and none to the contrary.

In Igoe Bros. v National Surety Co., 112 N. J. L. 243, 169 A. 181, 96 A.L.R. 1422, the court held as stated in the fifth paragraph of the syllabus as reported in 96 A.L.R.:

"A statute providing that upon the trial of an action the court shall award to the prevailing party a reasonable attorney's fee, to be taxed as costs and be included in the judgment rendered, does not impair contractual obligations, as applied to a surety on a contractor's bond who became such before the statute was enacted."

The authorities seem to be uniform upon this subject.

Of course not all statutes changing the law as to costs are constitutional, but the unconstitutionality does not result from lack of power to make such a law have a retroactive operation. The invalidity, when it exists, results from the provision of the particular statute whereby it violates some constitutional provision other than the due process clause or the prohibition against impairment of the obligations of contracts. Most frequently it is because the statute violates the equal protection clause of the 14th Amendment of the United States Constitution. This statute is not open to such an attack. It does not single out mortgages and subject them to the payment of attorney fees without imposing a like burden upon other persons in the same or similar litigation. It simply provides that the costs of sale shall be borne by the res which is the subject-matter of the action. There is no discrimination among the parties to the litigation or as between them and others similarly situated. Notwithstanding the equal protection clause of the 14th Amendment, the state legislature has a right to classify for the purpose of legislation, provided there is a valid basis for the classification, and the law affects equally all coming within the class. A classification based on the distinction resulting from the devolution of property upon the death of the owner, and providing a special remedy for that class with the incidental provision for the payment of the costs, does not infringe the equal protection clause. It affords the same remedy at the same cost to all those in the same situation.

For these reasons, the judgment is affirmed.

Judgment affirmed.

ROSS, PJ, concurs.