**UNITED STATES v. ALEXANDER WOOL COMBING CO.**

No. 4121.

District Court, D. Massachusetts.

June 4, 1946.

**390**

Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., John F. Sonnett, Asst. Atty. Gen., and Walker Lowry and A. Morris Kobrick, Attys., Dept. of Justice, both of Washington, D. C., for plaintiff.

Hutchins & Wheeler, Withington, Cross, Park & McCann, and Edward C. Park, all of Boston, Mass., for defendant.

WYZANSKI, District Judge.

This is an action pursuant to § 403(c) of the Renegotiation Act, 56 Stat. 226, 245, 50 U.S.C.A.Appendix, § 1191, in which the United States seeks to recover from defendant "excessive profits" during defendant's two fiscal years ending June 30, 1942, and June 30, 1943.

The complaint states that on September 6, 1944, the UnderSecretary of War, acting under the authority of the Renegotiation Act determined that of the profits realized by defendant during the fiscal year of defendant ending June 30, 1942, on its contracts and subcontracts subject to renegotiation $22,500 were excessive profits, and that of the profits realized by defendant during the fiscal year of defendant ending June 30, 1943, on its contracts and subcontracts subject to renegotiation $45,000 were excessive profits. Plaintiff attached copies of the two determinations. Plaintiff further alleged that defendant was entitled under § 3806 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 3806, to tax credits of $15,020.80 and $36,596.42; that defendant has not petitioned the Tax Court for redetermination of the excessive profits; that plaintiff has made demand for the net balance; and that defendant has not made payment.

The statutory background for this action is somewhat complicated.

The original Renegotiation Act was enacted as Title IV of the Sixth Supplemental National Defense Appropriation Act, 1942, Act of April 28, 1942, c. 247, 56 Stat. 226, 244–247. Section 403(c), 56 Stat. 245, 246 provided that "the Secretary of each Department is authorized and directed, whenever in his opinion excessive profits have been realized * * * from any contract with such Department or from any subcontract thereunder, (1) to require the contractor or subcontractor to renegotiate the contract price, (2) to withhold from the contractor or subcontractor any amount of the contract price which is found as a result of such renegotiation to represent excessive profits, and (3) in case any amount of the contract price found as a result of such renegotiation to represent excessive profits shall have been paid to the contractor or subcontractor, to recover such amount from such contractor or subcontractor."

The original act was amended by Title VIII of the Revenue Act of 1942, Act of Oct. 21, 1942, c. 619, 56 Stat. 798, 982–985. Section 801(a), 56 Stat. 982, of that act provided that for the purposes of § 403(a)

of the Sixth Supplemental National Defense Appropriation Act,

"(4) The term 'excessive profits' means any amount of a contract or subcontract price which is found as a result of renegotiation to represent excessive profits.

"(5) The term 'subcontract' means any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of another contract or subcontract. The term 'article' includes any material, part, assembly, machinery, equipment, or other personal property."

The same Section 801(a), amended § 403(c)(3) so as to provide that "in determining the amount of any excessive profits to be eliminated hereunder the Secretary shall allow the contractor or subcontractor credit for Federal income and excess profits taxes as provided in section 3806 of the Internal Revenue Code." 56 Stat. 983. It further amended § 403(c)(6) so as to provide that the Renegotiation Act "shall be applicable [with some exceptions] to all contracts and subcontracts hereafter made and to all contracts and subcontracts heretofore made." 56 Stat. 984. Congress enacted other amendments subsequent to the ones already cited but they do not need to be commented upon now.

The material facts of this controversy can be shortly stated.

Defendant is a Massachusetts corporation engaged in the business of combing grease wool into tops and noils. During its fiscal years ending June 30, 1942, and June 30, 1943, it had no direct contracts with any department or agency of the United States. It combed wool for different private companies. It knew that some of the wool it combed for the companies was destined for use in government contracts, but it was and is ignorant as to the destination of other wool.

In 1943 representatives of defendant conferred in Boston with representatives of the Secretary of War in regard to renegotiation of defendant's contracts. In 1944 representatives of defendant appeared before a panel of the War Department Price Adjustment Board in Washington. At these meetings defendant submitted all the evidence which was sought. Defendant requested to be shown, but was denied the right to see, data on the sales, prices and profits of such other persons as the War Department considered in determining defendant's case. Defendant never received a statement from the War Department of the principles it applied in determining its case.

September 6, 1944, the Undersecretary of War issued the two determinations which are attached to the complaint and to which reference has already been made. Except for general recitals, these determinations do not give much detail as to what facts were taken into account or what reasons were considered controlling by the issuing authority.

It is defendant's position that these determinations cannot be made the basis of any liability on its part because in its view (1) except by taxation or by eminent domain, Congress has no power even in time of war to require a person with whom the government has no direct contract to yield to the government excessive profits he has derived indirectly from contracts to which the government and others are parties; (2) if Congress has such power, it has attempted, in violation of Article I of the United States Constitution, to delegate that power to executive officials without giving them any adequate standards to govern their discretion; and (3) even if Congress has such power and has properly delegated it to the executive, the executive in this case proceeded so arbitrarily as to deny the due process guaranteed by the Fifth Amendment, and such denial must be reviewable in a court established under Article III of the United States Constitution.

■ Defendant's first contention is that Congress cannot under the powers conferred by United States Constitution, Article I, enact legislation to recapture excessive profits made in time of war. The constitutional provisions which permit Congress in time of war to provide for the establishment of maximum prices, Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, and maximum rents, Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892, also permit Congress to provide for

renegotiation of contracts to recapture excessive profits. The aggregate of Constitutional powers usually called the war powers enables the national government (in order to protect itself from war profiteers and in order to keep within reasonable limits the cost of waging war) to recapture part of any unusually high profits made directly or indirectly from governmental contracts. Recapture of high profits is a not unprecedented legislative remedy, Dayton-Goose Creek R. v. United States, 263 U.S. 456, 44 S.Ct. 169, 68 L.Ed. 388, 33 A.L.R. 472, and its economic impact upon the person whose profits are recaptured is from a constitutional viewpoint indistinguishable from the economic impact of a maximum price law upon a person whose sale prices are regulated. In each case a ceiling is applied so as to restrict the height to which profits and prices might otherwise rise. The fact that one ceiling is applied after and the other before the sale is not from the standpoint of Congressional war power a significant constitutional difference, though it may be important as a business distinction.

■ Defendant's second contention is that the determinations are invalid because they are based upon a statute in which in violation of United States Constitution, Article I, delegated legislative power to an executive official without prescribing sufficient standards for his guidance. In particular, defendant asserts that the phrase "excessive profits" is a phrase without sufficient meaning to serve as a guide or standard. The answer to this contention is that so far as war powers are concerned, delegations of at least as broad scope and with as vague standards have been sustained. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892; O'Neal v. United States, 6 Cir., 140 F.2d 908. A similar answer to a similar contention was made in Spaulding v. Douglas Aircraft Co., Inc. et al., 9 Cir., 154 F.2d 419.

■ Defendant's next contention is that the proceedings contemplated by the Renegotiation Acts and actually followed in its case deprive it of the due process of law guaranteed by the Fifth Amendment because they do not involve any detailed findings of fact and because they were based on facts and principles, if any, not disclosed to defendant. Neither detailed findings or hearings nor any statement of governing considerations are required because the defendant, if it was dissatisfied with the ultimate determination reached by the executive, had a statutory right to a suit de novo in the Tax Court of the United States.

That statutory right is set forth in Section 701(b) of Title VII of the Revenue Act of 1943, Act of Feb. 25, 1944, c. 63, 58 Stat. 21, 87, which amended Section 403 of the Renegotiation Act by adding a new subsection 403(e) (2), 50 U.S.C.A.Appendix, § 1191(e) (2). That subsection provides that "any * * * contractor or subcontractor aggrieved by a determination of the Secretary made on or after the date of the enactment of the Revenue Act of 1943, with respect to any * * * fiscal year, as to the existence of excessive profits * * * may, within ninety days * * * after the date of such determination, file a petition with The Tax Court of the United States for a redetermination thereof." Upon such filing the Tax Court conducts "a proceeding de novo" and has the same powers and duties as if the matter were "a proceeding to redetermine a deficiency" in income taxes. 58 Stat. 86, 87.

In short the statute provided that if defendant was not satisfied with the manner in which the Secretary of War conducted proceedings, or with the chain of reasoning which he followed or with the result at which he arrived, defendant was free to go to another forum, the Tax Court. There, unembarrassed by the prior proceedings before the Secretary of War, defendant could try out his case and procure the judgment of a fresh tribunal. Compare Macauley v. Waterman Steamship Corporation, 66 S.Ct. 712.

■ Thus, even if it be assumed that the proceedings before the Secretary had an element of arbitrariness, and if it be assumed that the Secretary of War applied to this defendant a capricious and highly individualized method of treatment, that arbitrariness would not have prejudiced de-

fendant if, as provided by the Revenue Act of 1943, it had resorted to the Tax Court. Defendant's status now is exactly like that of the landowner in Utley v. St. Petersburg, 292 U.S. 106, 109, 54 S.Ct. 593, 595, 78 L. Ed. 1155, who was subjected to an assessment which he regarded as arbitrary but which, if he had acted promptly, he could have had examined de novo by an administrative tribunal. As Justice Cardozo said in recognizing liability on the assessment in that case: "This court will not listen to an objection that the charge has been laid in an arbitrary manner when an administrative remedy for the correction of defects or inequalities has been given by the statute and ignored by the objector."

■ But defendant suggests that it is not bound to resort to the administrative agency known as the Tax Court because Congress has not provided any appeal from that agency to the courts and because questions of law and fact such as defendant seeks to raise are questions as to which it is entitled to have the judgment at some stage either by a court established under Article III of the United States Constitution or by an administrative agency whose decision is reviewable in such a court. This point has already been raised and met in Spaulding et al. v. Douglas Aircraft Co., Inc., supra. Therefore, it will be enough to answer the point summarily. It is by no means clear that a person who is required to surrender not his capital but merely a portion of his profits has a Constitutional right to have a so-called "Constitutional court" pass upon any question in his case. But if such a Constitutional right exists, it will be time enough for the holder of the right to assert it and for a court to pass upon it when the Tax Court has made its decision.

■ Defendant suggests that, in part, this complaint and the Renegotiation Act seek to reach profits earned just before the passage of the Act. It is defendant's claim that this retroactive application of the statute would be in violation of the Fifth Amendment to the United States Constitution. If that claim could prevail in the face of Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87, 118 A.L.R. 1142, and the United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370, the place to have raised it initially was the Tax Court. Macauley v. Waterman Steamship Corp., supra.

■ That tribunal was also the place to raise the issue whether defendant was within the meaning of the Act a "subcontractor" and whether the profits it realized were within the coverage of the Act. Macauley v. Waterman Steamship Corp., supra.

■ Defendant not having followed the administrative remedy provided by law and not having resorted to the proper tribunal to challenge the government's assessment, there shall be entered in accordance with the complaint and motion

Judgment for plaintiff.