## LICHTER et al. v. UNITED STATES.

### No. 10312.

Circuit Court of Appeals, Sixth Circuit.

March 10, 1947.

Writ of Certiorari Granted June 16, 1947.

See 67 S.Ct. 1741.

Paul W. Steer, of Cincinnati, Ohio (Paul W. Steer and Steer, Strauss & Adair, all of Cincinnati, Ohio, on the brief), for appellants.

Ellis Lyons, of Washington, D. C. (John F. Sonnett, of New York City, Ray J. O'Donnell, of Columbus, Ohio, and William J. Dammarell, of Cincinnati, Ohio, and J. Francis Hayden and Ellis Lyons, both of Washington, D. C., on the brief), for appellee.

Before HICKS, SIMONS and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The questions involved in this appeal relate to the coverage and the constitutional validity of the Renegotiation Act of April 28, 1942, 56 Stat. 226, 245, as amended by the Revenue Act of 1943, the Act of February 25, 1944, 58 Stat. 21, 78, 50 U.S.C.A. Appendix, § 1191. The appeal is from a summary judgment entered in favor of the government against the appellants for the recovery of excessive profits made under subcontracts on construction work done for the War Department.

The appellants reside in Cincinnati and their partnership will be referred to as Southern. In 1942 Southern was a subcontractor in nine subcontracts awarded to it after competitive bidding, for the construction of buildings and facilities. The prime contracts likewise resulted from such bidding. On October 20, 1944, Robert P. Pat-

terson, then Undersecretary of War, issued an order pursuant to the Renegotiation Act, determining that Southern had realized, during 1942, excessive profits of $70,000 on its subcontracts, and directed it to pay into the Treasury the amount of such excessive profits less a tax credit of $42,980.61. Southern filed no petition with the Tax Court for a redetermination of the Undersecretary's order, and the time for filing such petition has long since expired. Of the nine contracts involved, four were executed prior to April 28, 1942, the date of the original Renegotiation Act, and the remaining five were executed prior to October 21, 1942 the date of the initial amendment to the Renegotiation Act. Of the nine contracts involved, only two were in an amount in excess of $100,000 and were executed prior to April 28, 1942. The remaining seven were for amounts less than $100,000. Southern having failed to comply with an order of the Undersecretary of War to repay the determined excessive profits to the government, the United States brought suit for recovery. Southern defended on the ground that all of the subcontracts were specifically exempt from renegotiation by the terms of the Act, as amended; that in any event its contracts executed prior to April 28, 1942 and those less in principal amount than $100,000 were not renegotiable; and finally, that the Renegotiation Act° is unconstitutional.

The district court held the Renegotiation Act as originally enacted, and as subsequently amended, to be a constitutional exercise of the war powers of the Congress, that it applied to excessive profits realized under contracts entered into prior to April 28, 1942, and as so applied was likewise constitutional; that the failure of the appellants to seek a review de novo in the Tax Court of the United States, of the Undersecretary of War's determination of excessive profits as provided by § 403 (e) (2) of the Renegotiation Act, foreclosed the appellants from asserting their defenses, other than the constitutional invalidity of the Act, in the District Court of the United States.

■ Southern's contention that the district court had jurisdiction to consider all of its defenses, derives from the chronological sequence of the Act and its amendments, and rests specifically upon the phrasing of the amendatory provisions of §§ 403(e)(2) and 403(c) of the Revenue Act of 1943. It points out that prior to that amendment the rights of any person involved in renegotiation procedures were the same as in reference to other statutes, so that the validity of any claim or defense could be determined in a judicial proceeding. This is made clear, it says, by the fact that the original bill before the Congress contained a provision prohibiting a contractor from going into the courts, which was stricken before its passage. It also points out that the requirement, if it be a requirement, that a contractor submit his claims to the Tax Court of the United States, first appeared in the Revenue Act of 1943, enacted February 25, 1944, and that its contracts, all being part of its 1942 business, were not thereby affected. A proper appraisal of this contention requires consideration of the terms of the amendment. Section 403(e)(2) provides: "Any contractor or subcontractor * * * aggrieved by a determination of the Secretary made prior to the date of the enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days * * * after the date of the enactment of the Revenue Act of 1943, file a petition with the Tax Court of the United States for a redetermination thereof, and any such contractor or subcontractor aggrieved by a determination of the Secretary made on or after the date of the enactment of the Revenue Act of 1943, with respect to any such fiscal year, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days * * * after the date of such determination, file a petition with The Tax Court of the United States for a redetermination thereof."

It urges that this language is permissive and not mandatory, and that this is made clear by contrast with the phrasing of §

403(c), which is as follows: "* * * If the Board does not make an agreement with respect to the elimination of excessive profits received or accrued, it shall issue and enter an order determining the amount, if any, of such excessive profits, and forthwith give notice thereof by registered mail to the contractor or subcontractor. In the absence of the filing of a petition with The Tax Court of the United States under the provisions of and within the time limit prescribed in subsection (e)(1), such order shall be final and conclusive and shall not be subject to review or redetermination by any court or other agency * * *."

It urges also that by § 403(c)(6) the application of subsection (c) is limited to amounts received or accrued for fiscal years ending after June 30, 1943, the provision being in the following language: "This subsection shall be applicable to all contracts and subcontracts, to the extent of amounts received or accrued thereunder in any fiscal year ending after June 30, 1943, * * .* ".

From this comparison of sections it is argued that, in the absence of the filing of a petition with the Tax Court, the order that is by § 403(c) declared to be final and conclusive and not subject to review or determination by any court, applies only to amounts received or accrued under renegotiable contracts for fiscal years ending after June 30, 1943. Even were the question open it would not be difficult to reject this contention. Section 403(e)(1) of the Act provides that the Tax Court " * * * shall have exclusive jurisdiction, by order, to finally determine the amount, if any, of such excessive profits * * *." In conferring jurisdiction upon a court or administrative tribunal it is neither novel nor unusual to use the term "may" in referring to the right of an aggrieved person to initiate proceedings. Indeed, a mandatory term such as "shall," would be in negation of the clear purpose of the Congress, for in conferring upon persons the right to avail themselves of remedies, the Congress does not undertake to compel them to do so, and if an option is implicit in the term "may," it is an option not as between the Tax Court and a constitutional court, but an option to seek or refrain from seeking review, and so to abide the administrator's determina-

tion. Moreover, it is incongruous to suggest that a procedure which is to be final and conclusive and not subject to review or redetermination by any court, permits avail to a court from which appeals lie, extending in some cases even to review by the Supreme Court of the United States.

But the question is not open. It was settled, in so far as present issues are concerned, by Macauley v. Waterman SS Corp., 327 U.S. 540, 66 S.Ct. 712, in reliance upon Myers v. Bethlehem Shipping Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638. There it was held, in rejecting argument similar to that here presented, that § 403(e)(1) confers power upon the Tax Court to decide questions of coverage, for a decision as to what are and what are not negotiable contracts is an essential part in determining the amount of a contractor's excessive profits, an the legislative history of the Renegotiation Act shows that the Congress intended the Tax Court to have jurisdiction to decide questions of fact and law. The latter included the issue raised there as it includes the issues raised here. The Waterman case is even broader than that in its scope, for even were we to concede that the language of the jurisdictional grant to the Tax Court is permissive rather than mandatory, Southern would still be foreclosed in presenting its claims or defenses in the district court, by the application made in the Waterman case of the rule which requires a litigant, before resorting to judicial remedies, to exhaust his administrative remedies. Of similar import is United States v. Ruzicka, 67 S.Ct. 207, 211. There, in considering the general scheme of the Agricultural Act of 1937, 7 U.S.C.A. 601 et seq., it was said, "This is not Stark v. Wickard, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733. In that case it was concluded that since Congress had provided no administrative remedy for a producer to review the legality of an order against him, presumably the courts were not closed to him. But by § 8c(15) Congress has made precisely such provisions for handlers. As to them the procedural scheme is complete." If the Renegotiation Act is a constitutional exercise of the war powers of the government and was in this case constitutionally applied, the district

court was right in granting summary judgment.

■ But Southern urges that the Act itself is unconstitutional and the government, in argument, concedes that the court was not without jurisdiction to determine whether the Act was Constitutional upon its face. Southern challenges validity on the ground that the Act contains no standards for guidance in renegotiation; that there is no definition of the term "excessive profits," no requirements of methods to be followed in administration by which Congress, the courts or public may determine whether the congressional policy has been executed. While the constitutional validity of the Renegotiation Act has not yet been presented to the Supreme Court, its decisions in comparable cases clearly indicate that recognized tests of constitutionality have been met, Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Hirabayashi v. United States, 320 U.S. 81, 93, 63 S.Ct. 1375, 87 L.Ed. 1774, and inferior and intermediate courts which have considered validity are in accord. R. E. Spaulding et al. v. Douglas Aircraft Co., Inc., 9 Cir., 154 F.2d 419; United States v. A. W. Pownall et al., D.C.S.D.Cal., 65 F.Supp. 147. So with its retroactive application. As was said by District Judge Wyzanski in United States v. Alexander Wool Combing Co., D.C.D.Mass., 66 F.Supp. 389, 393, in rejecting a claim that the retroactive application of the Act would be in violation of the Fifth Amendment, "If that claim could prevail in the face of Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87, 118 A.L.R. 1142, and United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370, the place to have raised it initially was the Tax Court."

■ Southern's principal contention relates to the lack of precise definition of the term "excessive profits." It would be strange, indeed, if, after public discussion and criticism of excessive profits of war suppliers in two world wars and the period intervening, there would not have developed in the mind of the Congress and of administrators, some concept of the evil that the phrase connotes. There are terms in legal parlance, such as "reasonable man," or the term "invention" in the patent law, that are impossible to define, yet serve a useful purpose in assaying conduct, measuring achievement or abstractions, and courts and legislatures have evolved tests by which their application may be governed. The present statute is not without such tests, for § 701(b), Act Feb. 25, 1944, requires, in determining excessive profits, that consideration be given to the efficiency of the contractor; the reasonableness of his costs and profits; the amount and source of public and private capital employed and his net worth; the extent of risk assumed; the nature and extent of his contribution to the war effort; the character of his business, including the complexity of his manufacturing technique; and such other factors, the consideration of which the public interest and fair and equitable dealing may require.

■ No constitutional infirmity inheres in a statutory grant of discretion to administrators in executing the policy of the Congress. Without discretionary latitude, narrow or broad, as the situation requires, enforcement would in most cases be impossible. As was said in Yakus v. United States, supra, 321 U.S. at page 424, 64 S.Ct. at page 667 "The Constitution as a continuously operative charter of government does not demand the impossible or the impracticable. It does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itself properly to investigate."

The judgment below is affirmed.