UNITED STATES et al. v. HOWELL ELECTRIC MOTORS CO.

No. 6700.

District Court, E. D. Michigan, S. D.

May 21, 1948.

Roger P. O'Connor, Asst. U. S. Atty., of Detroit, Mich., for plaintiffs.

Miller, Canfield, Paddock & Stone, of Detroit, Mich., for defendant.

PICARD, District Judge.

This action relates to interpretation of the Renegotiation Act and the several amendments thereto. While defendant insists it is only testing constitutionality of the retroactive provisions in the second amendment thereto, (enacted July 1, 1943) which makes it effective as of April 28, 1942, a good part of its brief is devoted to the contention that such amendment, as worded, carries no retroactive provision.

### Findings of Fact

Defendant, a manufacturing corporation, sold a variety of items for use in the war effort. Approximately thirty-seven per cent of its sales (fiscal 1942) were made directly or indirectly to subsidiaries of the Reconstruction Finance Corporation, principally, Defense Plant Corporation. The balance was sold directly or indirectly to the War, Navy and Treasury Departments and the Maritime Commission. Sales to the four latter departments were accepted as renegotiable and a refund agreement for excessive profits was signed. Defendant, however, declined to include sales to RFC subsidiaries for the reasons above given. The amount due is not in question. If plaintiffs can recover they will have judgment for $20,000.00 plus interest as stipulated, defendant having already received payments from Defense Plant Corporation for all sales to that department before the second amendment became law.

On the other hand, in addition to their claim that the second amendment did in-

clude a retroactive provision which is constitutional, although it affected contracts where final payments had been made to the manufacturer after April 28, 1942 and before July 1, 1943, plaintiffs also contend that if defendant desired exemption of its 1942 war profits, it should have petitioned the Tax Court for a rehearing after the RFC Price Adjustment Board had ruled against it. Congress, say plaintiffs, gave that court exclusive jurisdiction to decide the issue whether of fact or of law and this, defendant failed to do, within the time provided.

Development of the renegotiation of war contracts legislation is important. The first Renegotiation Act enacted April 28, 1942, Public Law 528, 77th Congress, 2d Sess., a rider to the Sixth Supplemental National Defense Appropriation Act, 56 Stat. 226 authorized War and Navy Departments and the Maritime Commission to renegotiate excessive profits realized from contracts with those departments. In section 403 (a) thereof the first amendment, enacted October 21, 1942, Public Law 753, 77th Congress, 2d Sess., 50 U.S.C.A. Appendix, § 1191 (a), expanded such authority to include the Treasury Department. This first amendment was also made effective as of April 28, 1942, same as the original act. The second amendment, the one in question, enacted July 1, 1943, Public Law 108, 78th Congress, 2d Sess., 57 Stat. 348, further extended this authority to the four subsidiary corporations of RFC, among them Defense Plant Corporation. It did not, however, carry the specific language that: "The amendments made by this section shall be effective as of April 28, 1942." as written in the original act and first amendment thereto, but it did provide: "That section 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, as amended, is further amended by adding at the end thereof the following subsection: "(k) All the provisions of this section shall be construed to apply to Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company." the four subsidiaries of RFC. Subsection (k) above is part of section 403 and it is a further fact that section 403 subsection (c) of the Renegotiation Act, as rewritten in the first amendment, (subsec-

tion(c) (6) ) has the following provision: "This subsection (c) shall be applicable to all contracts and subcontracts hereafter made and to all contracts and subcontracts heretofore made, whether or not such contracts or subcontracts contain a renegotiation or recapture clause, unless (i) final payment pursuant to such contract or subcontract was made prior to April 28, 1942;" (Substantially as contained in original Renegotiation Act Section 403 (c) )

Plaintiffs seek to enforce the RFC Price Adjustment Board's order determining that defendant during the fiscal year, ending, December 31, 1942, had realized excessive profits on its contracts and subcontracts with RFC subsidiaries and directing it to return such profits.

## Conclusions of Law

The first issue therefore is whether Congress, in enacting the second amendment, either inadvertently or purposely, omitted to include, as renegotiable, contracts made by defendant with any one of the four RFC subsidiaries on which final payments had been made between April 28, 1942 and July 1, 1943.

To this court there is nothing ambiguous about the language used in the second amendment or the meaning and intent thereof. Its purpose was simply to increase the power of other departments of the government having charge of placing war orders so they too could renegotiate. The second amendment provided in subsection (k) words that can be easily understood and appraised. It aimed to include all amendments of section 403 then in force. In that act, as it then stood, was the provision of section 403, subsection (c) (6) specifically making all provisions of the section applicable to all contracts and subcontracts heretofore entered into whether they contained a renegotiation or recapture clause, unless the final payment had been made prior to April 28, 1942. True the second amendment did not use the same words of retroactivity as used in either the original act, amendment one, or amendment three, enacted July 14, 1943, 57 Stat. 564, fourteen days after the second amendment, Public Law 149, 78th Congress, 1st Sess. But we know of no rule of law that

requires phraseologists or legislative lexicologists to use the precise language in one act that it has used before to express the same meaning. An act has to be read with its amendments which should fit into those parts specifically provided by the wording thereof, (50 American Jurisprudence, section 468) and it is clear to this court that that is exactly what Congress did when it added subsection 403 (k). It is well to note that subsection (k) states that:

"All the provisions of this section shall * * *" The section referred to was section 403 and among the then provisions was subsection (c) (6).

■ As stated in National Electric Welding Machines Co. v. Stimson et al., 10 T.C. 49: "We think it evident that both the structure of the statute and the requirement that legislative language shall be deemed to have had some purpose require the interpretation that the amendment including DPC contracts was intended to be retroactive to the date of the enactment of the original Renegotiation Act. No other reason for the additional language contained in subsection (k) is apparent. If the only purpose to be served had been to include DPC contracts prospectively, that would have been accomplished by the amendment to section 403 (a) (1)."

■ The above, while not conclusive, is persuasive, because we believe it is good law. On this point we hold, therefore, that the second amendment was retroactive.

### Legislative Intent

To bolster up their position that such was the intent of Congress, plaintiffs provided affidavits from Senator Thomas, member of the Senate Appropriations Committee, to which the bill was referred, and Mr. John D. Goodloe, general counsel to the RFC. Defendant moved to strike these affidavits from the records as being inadmissible, citing authorities.

■ We agree with defendant that this act is not ambiguous and therefore there is no real need for introduction of reports or speeches made on the floor of Congress at the time of enactment of this legislation. But if it can be construed that interpretation is not clearly apparent by a fair reading of the language used, then any information or evidence bearing upon the intent of Congress, may be produced. As stated by the Supreme Court in United States v. Dickerson, 1940, 310 U.S. 554, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356: "It would be anomalous to close our minds to persuasive evidence of intention on the ground that reasonable men could not differ as to the meaning of the words. Legislative materials may be without probative value, or contradictory, or ambiguous, it is true, and in such cases will not be permitted to control the customary meaning of words or overcome rules of syntax or construction found by experience to be workable; they can scarcely be deemed to be incompetent or irrelevant. See Boston Sand & Gravel Co. v. United States, supra, 278 U.S. [41], at page 48, 49 S.Ct. 52, at page 53, 73 L.Ed. 170. The meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction."

In United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, the court said: "When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'" See also National Electric Welding Machines Co. v. Stimson, supra.

While the affidavit of the general counsel of the RFC and that of a member of the committee before which the bill was being discussed, would in all likelihood bear little weight if they were contradicted by the clear wording of the act, by the Journal of either House or Senate, or the record of the committee itself, here according to the affidavits, the important question as to how the act should be worded, if it were to be made retroactive and how if the contrary was the desire of Congress, was asked by Senator Thomas during committee hearings. The wording then used followed the advice on how to make the act retroactive. This evidence is aided by the statement of Mr. Jesse Jones before the Ways and Means Committee of the House (September 10, 1943) when he said: "* * * The amend--

ment suggested for use, in the event the Congress wished to make subject to re-negotiations the R.F.C. subsidiary contracts under which final payment had not been made prior to April 28, 1942, was added in conference on the Military Appropriations Act of 1944. I call attention to this particularly since it seems to me to clearly evidence the intention of the Congress that the amendment was to be retroactive in its application to the contracts of the four R.F.C. subsidiaries."

 In truth all proof before this court would indicate that not only did Congress do what it intended to do—make the July 1, 1943 amendment retroactive—but it had discussed the question at length at least in the committee. No evidence to the contrary has been shown and we deem the affidavits as competent corroboratory testimony.

### Exclusive Jurisdiction of Tax Court

It is plaintiffs' further contention that the exclusive jurisdiction to determine whether certain contracts are subject to renegotiation lies in the Tax Court and that defendant should have petitioned the Tax Court for a trial de novo, as provided in a further enactment of Congress, effective February 5, 1944, Public Law 235, 78th Congress, 2d Sess. 1, 58 Stat. 21, 78. Section 403 subsection (e) (1) of that amendment reads: " * * * such court (Tax Court) shall have exclusive jurisdiction, by order, to finally determine the amount, if any, of such excessive profits received or accrued by the contractor or subcontractor, and such determination shall not be reviewed or redetermined by any court or agency. * * * A proceeding before the Tax Court to finally determine the amount, if any, of excessive profits * * * shall be treated as a proceeding de novo."

This question of exclusive jurisdiction of the Tax Court was settled, we believe, in Macauley v. Waterman S. S. Corp., 1946, 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 in which case the contractor maintained that he had made no contracts directly with the United States but with Great Britain and for that reason the Maritime Commission's Price Adjustment Board had no jurisdiction to renegotiate. The Supreme Court stated,

327 U.S. at page 544, 66 S.Ct. at page 714, 90 L.Ed. 839:

"For a decision as to what are and are not negotiable contracts is an essential part in determining the amount of a contractor's excessive profits. The legislative history of the Renegotiation Act, moreover, shows that Congress intended the Tax Court to have exclusive jurisdiction to decide questions of fact and law, which latter include the issue raised here of whether the contracts in question are subject to the Act."

"One of the sponsors of the Renegotiation Act in the House explained the Bill as providing that the Tax Court could make decisions on all 'questions of fact and law * * *.' 90 Cong.Rec. 1355."

See also Aircraft & Diesel Equipment Corp. v. Hirsch, 1947, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796, and in this very circuit Lichter v. United States, 6 Cir., 160 F. 2d 329, 331, a case, where as here, the government brought suit to recover excesssive profits after the contractor had received payment. The court said: "403(e) (1) confers power upon the Tax Court to decide questions of coverage, for a decision as to what are and what are not negotiable contracts is an essential part in determining the amount of a contractor's excessive profits, and the legislative history of the Renegotiation Act shows that the Congress intended the Tax Court to have jurisdiction to decide questions of fact and law."

 It appears to this court upon the reading of these and other authorities that "coverage" is a matter exclusively for the Tax Court. It has the facilities; it has the experts, the accountants and others to deal with fiscal matters. For that reason Congress intended to place "coverage" entirely within the Tax Court. First, a contractor must appear before the Price Adjustment Board set up by the RFC to renegotiate war contracts made with anyone of its four subsidiaries and then, being aggrieved, appeal to the Tax Court. That is the way we interpret the Lichter case, supra, which further held that by failing to appear before the Tax Court, defendant therein had lost its defense of coverage. There is, of course, a difference between coverage and constitutionality. A law, may, as here, spe-

cifically cover the rights and obligations of a contractor and his failure to avail himself of those rights or accepting his obligations as provided in the act may be fatal; still the act, when questioned, may be found unconstitutional. If it is he has lost nothing; if it is constitutional he assumed a risk and must pay the penalty. Having decided in this case that the act, as amended, did provide retroactive powers to the RFC subsidiaries, we must necessarily hold that the question of whether or not it applied to this defendant was exclusively within jurisdiction of the Tax Court which brings us to the final question, to-wit:

### Is the Renegotiation Act's Second Amendment Retroactive Provision Constitutional?

The Supreme Court has not passed upon this question but in Lichter v. United States, supra, our Court of Appeals said: "While the constitutional validity of the Renegotiation Act has not yet been presented to the Supreme Court, its decisions in comparable cases clearly indicate that recognized tests of constitutionality have been met."

This case is now before the Supreme Court together with Alexander Wool Combing Company v. United States of America, 1 Cir., 1947, 160 F.2d 103, adopting lower court opinion D.C.D.Mass.1946, 66 F.Supp. 389 and Pownall v. United States, 9 Cir., 1947, 159 F.2d 73. See 68 S.Ct. 1294.

In the case at bar defendant contends that Congress studiously avoided making the July 1, 1943 amendment retroactive because it feared for its constitutionality. Defendant reasons that the second amendment to the Renegotiation Act cannot constitutionally be applied retroactively to the period before July 1, 1943, because such application would constitute a deprivation of property without due process of law, contrary to the Fifth Amendment to the Constitution of the United States. It cites many cases in support of that theory, among them the Sinking Fund Cases, 1878, 99 U.S. 700, 25 L.Ed. 496, 504. The reference is an unhappy one for defendant because at page 718 of 99 U.S., 25 L.Ed. 496, 504, it states: "The United States cannot

any more than a State interfere with private rights, *except for legitimate governmental purposes."* (Italics ours) Defendant notes other exceptions further admitting that in Norman v. Baltimore & O. R. Co., 1935, 294 U.S. 240, 55 S.Ct. 407, 79 L. Ed. 885, 95 A.L.R. 1352, under its power to regulate money; in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, by virtue of its power to regulate interstate commerce; and in Louisville & Nashville R. Co. v. Mottley, 1911, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A.,N.S., 671, where it held invalid a contract providing for a free pass on a railroad for life, all of which affected private contracts and in all of which the provisions of the Fifth Amendment were held not breached. Quoting from the Norman v. Baltimore & O. R. Co. case, supra [294 U.S. 240, 55 S.Ct. 416] " * * * when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."

If Congress has the right under the Constitution as amended to abrogate contracts as it has done in the several cases cited by defendant and for the reasons therein given, why should it not have the same right in a contract affecting the carrying on of war? What more important function can government have than to protect its existence and to provide for the common defense? (See cases cited on this issue in Bateman v. Ford Motor Co., D.C., 76 F.Supp. 178.) In 1942 and 1943 the United States of America was engaged in a titantic struggle for survival. In the hurry to prepare for war it made contracts with defendant and others. The government was then in the business of carrying on that war under unpredictable and uncertain conditions. The path to victory bore no definite sign posts or earmarks. Guns, ammunition, clothing, food, etc. had to be provided and quickly. In order to obtain results and to prepare to meet and then carry battle to our adversaries, no picayune financial policy could be formulated or delay invited. Get prepared. But the first World War had taught our government one very important step, to-

wit: renegotiation of war contracts was necessary. The greedy contractor who would take advantage of the urgent demand and need had to be made to return his excess profits and the patriotic contractor would always be receptive to a law that protected both the government and himself. That was the purpose of the law but unfortunately, some, like defendant, whose patriotism is not questioned, deem it an unwarranted hardship never intended or expected by Congress. Of course Congress probably anticipated that some one might be harmed although we have never known an instance where excessive profits on a war contract could be justified. Is it not, to say the least, "unfair enrichment?" It had even been contended that as the law stood before the second amendment was enacted, Defense Plant Corporation war contracts were subject to renegotiation. (See joint statement by War, Navy and Treasury Departments and Maritime Commission, March 31, 1943). This, of course, was only an opinion, not an act of Congress.

But this court would be more impressed with this contention were it not for the inconsistency of defendant's position. Defendant reasons that there is a difference between applying an amendment to all contracts that have been paid in full between April 28, 1942 and July 1, 1943, and contracts which were paid in full before April 28, 1942; that while Congress might have had the right originally to include all contracts before April 28, 1942, it cannot require repayment of money for contracts paid in full between that date and July 1, 1943.

There is some merit to that reasoning but we believe it is offset by the general power of Congress to wage war. When the Renegotiation Act was first enacted April 28, 1942, certainly there must have been some contracts on which part payments had been made; still the Renegotiation Act included all those contracts as renegotiable and only exempted contracts where payments had been made in full. When the day of reckoning came on the final payment, the moneys that had been received on such contracts not paid in full prior to April 28, 1942, were considered with those payments becoming due after April 28, 1942. Still defendant does not question the right of Congress to enact any part of the original Renegotiation Act.

Continuing to the first amendmnt of the Renegotiation Act giving the Treasury Department right of renegotiation, we find that defendant does not question Congress' power to enact the retroactive provision in this legislation and there must have been a number of contracts that had been entered into by the Treasury Department where payments in full had been made after April 28, 1942 and before October 21, 1942.

So, also, as to the July 14, 1942 or third amendment, enacted two weeks after the second amendment and which was made retroactive to all contracts not paid in full before April 28, 1942. Defendant does not question the constitutionality of that amendment.

It is apparent, therefore, that defendant's position is paradoxical. If the second amendment is unconstitutional for retroactivity so are the first and third, which are not attacked by defendant. Furthermore in the railroad pass case, Louisville & Nashville R. Co. v. Mottley, supra, Congress not only prohibited railroads from granting any new passes or accepting any substitute for a cash fare, which was prospective, but it eliminated railroad passes that had been theretofore issued and this was retroactive. In that instance there was a clear deprivation of vested rights in a contract that had been completed by the parties, but the Supreme Court held that Congress has such right.

Furthermore, the cases cited by defendant only prove that Congress may destroy or impair the obligation of a contract where it has a legitimate governmental purpose founded on constitutional power. As stated in Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 239, 78 L.Ed. 413, 88 A.L.R. 1481: " * * * the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." In the case at bar, such constitutional power is found in the Preamble to the Constitution of the United States, to-wit: "provide for the common defense, promote the general Wel-

'fare," and in Art. I Sec. 8, particularly clauses 11 to 18 inc. containing the power to declare and carry on war.

It is our holding therefore:

First, that the July 1, 1943 amendment is clear and unambiguous and extends the power to subsidiaries of RFC to renegotiate, retroactively, its contracts or subcontracts upon which final payment has not been made prior to April 28, 1942;

Second, that the affidavits of Senator Thomas and Mr. Goodloe are admissible;

Third, that the question of whether or not defendant was subject to the amendment was a question exclusively for the Tax Court; and

Fourth, that while we believe defendant had and has the right to test the constitutionality of any act in a district court, in passing upon the merits of that contention, we hold that the above retroactive provisions of the second amendment are constitutional.

Judgment for plaintiffs.