HOLLINGSWORTH et al. v. FEDERAL MINING & SMELTING CO. (UNITED STATES, Intervener).

No. 1657.

District Court, D. Idaho, N. D.

Dec. 12, 1947.

T. P. Wormward, of Kellogg, Idaho, Leif Erickson, of Helena, Mont., H. L. Maury, A. G. Shone, and George R. Maury, all of Butte, Mont., for plaintiffs.

C. W. Beale, of Wallace, Idaho, Robert E. Brown, of Kellogg, Idaho, Carl E. Croson, of Seattle, Wash., H. J. Hull, of Wallace, Idaho, Randall & Danskin, of Spokane, Wash., Chas. E. Horning, of Wallace, Idaho, John Gavin, of Yakima, Wash., Paul B. Jessup, of Wallace, Idaho, Lester S. Harrison, of Kellogg, Idaho, W. F. McNaughton, of Coeur d'Alene, Idaho, and E. B. Taylor, of Hailey, Idaho, for defendants.

John A. Carver, U. S. Dist. Atty., and E. H. Casterlin, and Paul S. Boyd, Asst. U. S. Dist. Attys., all of Boise, Idaho, for intervenor.

CLARK, District Judge.

The plaintiffs in this case, who were employees of the defendant, have brought the action for overtime compensation under the Fair Labor Standards Act, based upon time spent by them in walking and in preliminary, and other activities on the premises of the defendant before and after the regularly scheduled work period.

There are 27 other cases before this Court involving a great number of employees, and the same state of facts, as far as the complaints are concerned, is involved in each case.

Briefs have heretofore been filed and oral arguments had, and by agreement of Court and all counsel, the 27 other cases are submitted on the briefs and arguments presented herein.

The defendants have interposed numerous motions but the only one the Court is now considering is the motion to dismiss on the following grounds:

1. That the complaint fails to state a claim upon which relief can be granted to the plaintiffs or any of them, or to the persons claimed to be represented by the plaintiffs.

2. That the Court lacks jurisdiction.

The complaint is as follows:

"The plaintiffs, for claim and demand against the above named defendant, allege:

"1. The plaintiffs allege that this action arises under the provisions of the Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219, known as the Fair Labor Standards Act of 1938, a law of the United States regulating interstate commerce, and jurisdiction is conferred upon this Court by Section 41(8), 28 U.S.C.A. giving the District Court original jurisdiction 'of all suits and proceedings arising under any law regulating commerce,' and by Sec. 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b).

"Plaintiffs bring this action for and in behalf of themselves, individually, and as agents and representatives for and in behalf of the employees of the defendant Company named in Schedules 'A' and 'B,' hereunto annexed and made a part hereof as though fully set forth herein, and for and in behalf of all of the employees of the defendant similarly situated to those employees named in Schedules 'A' and 'B' who may join herein by designating the plaintiffs as their agents and representatives to maintain this suit in their behalf. The plaintiffs herein and all of the individuals named in schedules 'A' and 'B' hereto annexed are or were employees of the defendant, and the plaintiffs and those joining herein and named in schedules 'A' and 'B,' and all others who are or were employees of the defendant and similarly situated to the plaintiffs and to those named in schedules 'A' and 'B' and who may join in this action by intervention, amendment, designation, or otherwise, are hereinafter collectively referred to and called the employees.

"2. That the plaintiffs have been duly authorized and designated in writing by the persons named in Schedules 'A' and 'B' hereto annexed to maintain this action as their agents and representatives. Plaintiffs allege that there is in this action involved to all employees a common question of law, a common question of fact, and each seeks common relief, but by separate judgment or judgments.

"3. The defendant, Federal Mining & Smelting Company, hereinafter referred to and called 'the Company,' is now and at all times herein alleged was a corporation duly qualified to carry on business within the State of Idaho, and with its principal office within this state located at Wallace, Idaho.

"4. The defendant Company is now and at all times herein alleged was engaged in mining, milling, smelting, refining, processing, shipping and transporting in interstate commerce lead, gold, silver, copper, zinc, cadmium, and other minerals in and from Shoshone County, Idaho, and other counties in Idaho, and engaged in the production for and in the shipment of goods in interstate commerce, in that all of the said minerals are shipped and transported by defendant through channels of interstate commerce outside of the State of Idaho and into many of the states of the United States, and to foreign countries. The employees herein, and all those similarly situated for whom and in whose behalf plaintiffs bring this action and who are named in Schedules 'A' and 'B' hereto annexed, and all those who hereafter join in this action, are and at all times herein alleged were employees of defendant, directly engaged in the mining, shipping and transporting of the said minerals in interstate commerce, and in the production of said minerals for and in interstate commerce, and provided at all times herein alleged the work and labor essential to and necessary for said production and transportation of said minerals for and in interstate commerce.

"5. The defendant Company operates numerous underground mines and a mill, or mills, in Shoshone County, Idaho, at and in the vicinity of Wallace, Gem, Mullan, Page and Kellogg, Idaho; and in connection with said mining and milling operations the defendant maintains extensive surface operations, and each of its mines and mills is fenced and said underground mines and surface operations are commonly known as and hereinafter will be called the company operations. Included in said company operations and situated at each of its mines and mills are buildings housing hoisting machinery, tools, supplies, mills and timber, and there are at each of said mines and mills a supply house, tool house, mechanics' shop, repair shop, carpenter shops, wash and change rooms, storage buildings, and other buildings, all of which are necessary

for and used in the mines' and Mills' production of minerals by mining on the surface and underground, and of refining, processing, and shipping of said minerals in interstate commerce. Within the said Company operations are roadways for trucks and other vehicles, electric cables and power lines, and other stationary and movable machinery and equipment. The mining of minerals and mineral ores, crushing and refining, and processing, drying, storing and shipping, are so interconnected and integrated as to constitute a continuous process arranged by the Company for and resulting in a highly efficient utilization of equipment and power, and all integrated for the production of goods for interstate commerce.

"6. Plaintiffs allege that since on or about Oct. 24, 1940 to the date of the commencement of this action, the defendant Company, in Shoshone County, Idaho, has violated the provisions of Section 7(a) (3) of said Act, 29 U.S.C.A. § 207(a) (3), in that the work week of employees herein suing and represented, has been longer than forty hours, and such employees have received no compensation for their employment in excess of forty hours per week, although they, and each of them, were entitled to a rate of pay not less that one and one-half times the regular rate at which they and each of them were employed. Plaintiffs allege that after Oct. 24, 1940 the defendant Company worked all of the employees herein suing and represented, in violation of said Act, for a period of forty-six hours per week, without paying said employees for overtime, as provided in said Act, and there is now unpaid to said employees, by defendant, their overtime wages for a period of time from June 25, 1940, to the date of the commencement of this action, to-wit: January 10, 1947, for the hours overtime in excess of said statutory limitations, as well as liquidated damages in an amount equal thereto, all as is more fully set out in 29 U.S.C.A. § 207(a) (3) and § 216(b).

"7. Plaintiffs allege that the defendant Company fails to correctly record the time worked by its said employees. All underground employees were and are paid for an eight hour work shift, the eight hours extending from the time the employees enter the mine cage at the opening of the shaft until the employees emerge therefrom eight hours thereafter. All surface employees were and are paid for an eight hour work shift extending from the time when the said employees are at their positions and places of work until the time when, eight hours later, the said employees leave their places and positions of work; that ever since Oct. 24, 1940, the said defendant Company has required each of the employees in whose behalf this action is brought by the plaintiffs herein to work an extra one hour per day, or six hours per week, in addition to the time shown by the Company records so erroneously maintained as aforesaid, all of said six hours as aforesaid being worked by the employees herein in addition to the forty hours of work per week provided in the Fair Labor Standards Act hereinabove referred to, and for such overtime of one hour per day since Oct. 24, 1940 employees herein suing and represented have not been paid. That before said work shifts begin the employees enter through the Company gate at each mine and mill, and then are required to walk to the change house and put on their working clothes, and then go to the building or buildings to receive their lamps, batteries, tools, and equipment with which to work, and then go to the other building or buildings to receive their work orders and do other necessary work before going to their places of work in the underground mine, or in the surface operations, or to their places of work in the mills; and after their shift's work is finished they are compelled to deliver back their lamps, batteries, tools and equipment, and to report to their respective superiors the conditions of their places of employment and make reports concerning the working conditions for the safety of the men on the following shift, and then they are required to go to their wash and change rooms where they bathe and put on their street clothes, and then walk to the company gate and off the premises of the employer, and all of said duties are necessary and essential and demanded by the Company for its own use and advantage. The said employees expend mental and physical energy and labor for a period of one hour before the shift com-

mences work and after the shift is over, and such mental and physical labor and energy was and is essential, necessary for and required by the very character and nature of the work, and performed by the employees, and was and is pursued necessarily and primarily for the use and benefit of the Company and its business, and was and is required and controlled by the Company, and as such constitutes work and labor within the meaning of the Fair Labor Standards Act of 1938.

"8. Plaintiffs allege that they are not informed as to the exact amount of hours of overtime rendered by each of said employees, and further allege that such information is not available to them, but that the records thereof are, or should be, under the provisions of said Act, in the exclusive possession of the defendant herein; that interrogatories are attached hereto which plaintiffs respectfully ask the Court to compel defendant to answer; that plaintiffs are informed, and so allege the facts to be, that there is $1,593,000 due and unpaid to the employees of the defendant joining herein for overtime labor rendered by said employees in the employ of the defendant herein, in violation of said Fair Labor Standards Act of 1938, and all in violation of the express terms of said Act, and plaintiffs allege that by the aforesaid acts of the defendant, plaintiffs, for themselves and for others similarly situated, and joining herein, and as employees of the defendant, Federal Mining & Smelting Co., have suffered damages in the sum of $1,593,900 and for such other and further amount of wages as may be due to other employees similarly situated with the plaintiffs, and who may hereafter join herein. Those employees named in Schedule 'A' hereto annexed did not serve in the Armed service of the United States Government during World War No. 2, but those employees named in Schedule 'B' hereto annexed did serve in the Armed forces of the United States Government during World War No. 2.

"Wherefore, plaintiffs pray for themselves, and for the other employees similarly situated and joining herein, and in whose behalf this action is brought, judgment in the amount of $1,593,900 and costs of court, and also reasonable attorneys' fees for plaintiffs' counsel, and for such other and further amount of wages as may be due to other employees of the defendant similarly situated with plaintiffs, and who may hereafter join herein; that for all hours worked in excess of the hours specified in Sec 7(a) (3) of the Act, each employee herein recover from defendant one and one-half times the regular rate of wages at which he is or was employed, and for an equal additional amount as liquidated damages; further, that the defendant answer the interrogatories hereto annexed, and account to all employees joined herein for the wages due them for overtime since Oct. 24, 1940 and for such other and further relief as is just and proper in the premises."

It will be noted that the plaintiffs rely solely on the provisions of the Act of June 25, 1938, c. 676, 52 Stat. 1060, 29 U.S.C.A. §§ 201–219, known as the Fair Labor Standards Act of 1938, and upon Sec. 41 (8), 28 U.S.C.A., giving the District Court original jurisdiction "of all suits and proceedings arising under any law regulating commerce," and by Sec. 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b).

The defendants rely upon the Act of May 14, 1947, Public Law 49, 80th Congress, Chapter 52, 1st Session, H.R. 2157, 29 U.S.C.A. § 251 et seq., as grounds upon which their motion to dismiss should be granted.

█ If the law is constitutional then the motion should be granted. At the very threshold of this inquiry it can be said that Congress, the law making body, established by the Constitution, has full power to enact such laws as it decrees to be in the best interest of the country except in so far as that power is limited by our Constitution, and it is the duty of the Court to uphold the Acts of Congress unless such Acts are clearly unconstitutional. But it is equally true that the Court should be alert to protect the rights of the people under the Constitution.

█ On approaching this question it is well to first consider the original Act under which the complaint here in question was filed. It can be said without question that the Fair Labor Standards Act of 1938 was enacted by Congress because it found that

substandard labor. conditions existed which were detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency and general well-being of workers and thereby burdened Commerce and the free flow of goods in commerce; caused labor disputes that burdened and obstructed commerce and the free flow of goods in commerce and interfered with the orderly and fair marketing of goods in commerce.

It was clearly the intent and purpose of the Act to eliminate these conditions without curtailing employment or earning power. Sec. 206 of the Act provided for minimum wages; Sec. 207 provided for the maximum hours and time and one-half for overtime worked in excess of the maximum hours. Section 216 provides that any employer who violates the provisions of Sections 206 or 207 shall be liable to the employee affected in the amount of his unpaid minimum wages or his unpaid overtime compensation as the case may be and in an additional equal amount as liquidated damages together with attorneys fees. This was a mandatory law and the Court had no discretion as to the allowance of such additional amount.

It was ably contended before the Supreme Court of the United States in the case of United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 454, 85 L.Ed. 609, 132 A. L.R. 1430, that this Act was unconstitutional. The Court, however, in determining this question looked mainly to the purpose of the Act in considering the power of Congress to enact it. It was seriously contended in that case that Congress did not have the power to regulate interstate commerce. There were involved, as stated by the Court, two main questions: "First, whether Congress has constitutional power to prohibit the shipment in interstate commerce of lumber manufactured by employees whose wages are less than a prescribed minimum or whose weekly hours of labor at that wage are greater than a prescribed maximum," and "second, whether it has power to prohibit the employment of workmen in the production of goods 'for interstate commerce' at other than prescribed wages and hours." These questions were answered in the affirmative.

Without quoting at length, the Court in part said:

"The motive and purpose of the present regulation is plainly to make effective the Congressional conception of public policy that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows. The motive and purpose of a regulation of interstate commerce are matters for the legislative judgment upon the exercise of which the Constitution places no restriction and over which the courts are given no control. McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann.Cas. 561; Sonzinsky v. United States, 300 U.S. 506, 513, 57 S.Ct. 554, 555, 81 L. Ed. 772, and cases cited. 'The judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged power.' Veazie Bank v. Fenno, 8 Wall. 533, 548, 19 L.Ed. 482. Whatever their motive and purpose, regulations of commerce which do not infringe some constitutional prohibition are within the plenary power conferred on Congress by the Commerce Clause."

■ Whatever rights the plaintiffs had under this Act of 1938 were created by the Act itself. The plaintiffs contend that these rights are "contract" rights from which it follows that they are property rights.

To determine this it is necessary to ascertain the purpose of the legislation. The Supreme Court has announced that purpose in the case last above cited and it is clearly apparent from the Act itself that they are not private property rights but are statutory public rights granted incidentally in order to effectuate a declared legislative policy, and is a matter for legislative judgment upon the exercise of which the Constitution places no restriction and over which the Courts are given no control.

■ Every right the plaintiffs have is derived from the Statute and it is clear that Congress determined that the public interest was the paramount consideration, and while it can be said that public inter-

est was the motive, it was an Act which concerned the welfare of that class commonly known as the working man as well. Such a statute as this cannot be enacted without hurt to some and benefit to others. Congress as representative of the people as a whole considers the "greater good to the greater number" and after a law is put in force they study the results to determine if their purpose has been accomplished. If not, their right and duty is to modify or repeal and when the subject matter of an Act such as we have here, which concerns the welfare not only of a class but the public at large, persons acting under it are deemed to have acted in contemplation of the power of Congress to modify or repeal and that any such modification or repeal will operate to limit or take away the rights of recovery, unless it is provided in the Act itself that the rights are not to be affected.

In other words Congress has the right to give and the right to take away, for the rights given are rights that are only incidental to the main purpose of the Act; the regulation of commerce between the states; and when this is true, Congress is not interfering with any property right. It is only taking away a statutory right; a person acquiring such a right is no where protected by the Constitution.

The Supreme Court has upheld this Act of 1938 because it was within the power of Congress to regulate interstate commerce; in doing this they have said that Congress had the right to annul the contracts existing between the employer and employee at the time of its enactment and say to the employer just what he was to pay and to the employee that he could not receive less. Can it be said now that they have no power to change it? I think not. The 1938 Act was an exercise of the Congressional power to regulate interstate commerce. It was enacted for the purpose as I have said, or correction of conditions that were detrimental to the free flow of goods in commerce. The highest Court has said that the requirements of the Act are not unconstitutional. It has been followed with very little argument since its constitutionality has been upheld.

This action and companion actions were filed during the early months of 1947. They followed the decision of June 10, 1946, of the Supreme Court in the case of Anderson v. Mount Clemens Pottery Co., 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515, which was brought under the Fair Labor Standards Act of 1938. It was determined in that case that employers were liable under Section 7(a) of the Act for overtime compensation including the necessary time spent by the employees on their employers' premises walking to their work and other preliminary activities. When Congress found that such time was included in the overtime provision of the Statute and that following this decision by the Supreme Court nearly two thousand cases were filed, claiming overtime compensation for walking time and preliminary activities, in the aggregate amount of nearly six billion dollars (Senate Rept. No. 48, part 1, P. 2 to accompany H. R. 2157; 80th Congress 1st. Session) in portal-to-portal claims which had the effect of impairing the credit of the employers, interfering with collective bargaining with the employees, and retarding peace-time conversion, it began a study of the law to determine what action it should take.

The result of such study was the passage of Public Law 49, 80th Congress, Chapter 52, First Session, known as the "Portal-to-Portal" Act.

This Act was not passed until long and exhaustive hearings were held and a statement of findings and policy was made which we find included in Sec. 1 of the Act, which is as follows:

"(a) The Congress hereby finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital resources of many others, thereby resulting in the re-

duction of industrial operations, halting of expansion and development, curtailing employment, and the earning power of employees; (2) the credit of many employers would be seriously impaired; (3) there would be created both an extended and continuous uncertainty on the part of industry, both employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in; (6) voluntary collective bargaining would be interfered with and industrial disputes between employees and employers and between employees and employees would be created; (7) the courts of the country would be burdened with excessive and needless litigation and champertous practices would be encouraged; (8) the Public Treasury would be deprived of large sums of revenues and public finances would be seriously deranged by claims against the Public Treasury for refunds of taxes already paid; (9) the cost to the Government of goods and services heretofore and hereafter purchased by its various departments and agencies would be unreasonably increased and the Public Treasury would be seriously affected by consequent increased cost of war contracts; and (10) serious and adverse effects upon the revenues of Federal, State, and local governments would occur.

"The Congress further finds that all of the foregoing constitutes a substantial burden on commerce and a substantial obstruction to the free flow of goods in commerce.

"The Congress, therefore, further finds and declares that it is in the national public interest and for the general welfare, essential to national defense, and necessary to aid, protect, and foster commerce, that this Act be enacted.

"The Congress further finds that the varying and extended periods of time for which, under the laws of the several States, potential retroactive liability may be imposed upon employers, have given and will give rise to great difficulties in the sound and orderly conduct of business and industry.

"The Congress further finds and declares that all of the results which have arisen or may arise under the Fair Labor Standards Act of 1938, as amended, as aforesaid, may (except as to liability for liquidated damages) arise with respect to the Walsh-Healy and Bacon-Davis Acts and that it is, therefore, in the national public interest and for the general welfare, essential to national defense, and necessary to aid, protect, and foster commerce, that this Act shall apply to the Walsh-Healy Act and the Bacon-Davis Act.

"(b) It is hereby declared to be the policy of the Congress in order to meet the existing emergency and to correct existing evils (1) to relieve and protect interstate commerce from practices which burden and obstruct it; (2) to protect the right of collective bargaining; and (3) to define and limit the jurisdiction of the courts."

Counsel for the plaintiff contend that this finding and policy is improper and can not be considered in supporting the constitutionality of the Act and that such findings render the Act unconstitutional as an usurpation of Judicial power, and counsel for the plaintiff has insisted that it was an attempt on the part of Congress to reverse the United States Supreme Court.

As to it being improper: It is no more improper in this Act than it was in the Act of 1938. Very little, if any, distinction can be made. The only difference is in length and it covers what is covered in the 1938 Act in a general statement with specific statements.

As to Congress usurping the power of the Court or attempting to reverse it, this is an idle statement. The Court is the judicial branch, Congress is the legislative. The Court has met its duty when it interprets the laws as passed by Congress.

Congress is the law making body established by the Constitution and the responsi-

bility is its to enact good laws or bad laws and if it enacts a bad one it is not only within its power to modify or repeal it but it is its duty to do so.

Walking time and preliminary activities having come before the United States Supreme Court then it was the Court's duty to pass on the law as written. If it was a bad law that was not the Court's responsibility; they had fulfilled their duty when they interpreted it; then after Congress found the law needed changing or repealing it was its duty and obligation to modify or repeal the Act. Many a law has heretofore been repealed or modified after it has been interpreted by the Court. If the contention of plaintiffs is right in saying this is an interference with the Court and an usurpation of the Judicial power, Congress would be helpless to correct its mistakes and a bad law would have to stay as the law of the land forever. The findings of Section 1 of the 1947 Act sets forth "the motive and purpose of the Act."

The United States Supreme Court, when the Fair Labor Standards Act of 1938 was before it in the case of United States v. Darby, supra, looked to the motive and purpose of the legislation. The motive and purpose is just as important in the "Portal-to-Portal" Act of 1947.

█ It is the contention of the plaintiffs that Congress did not agree with, and criticize the interpretation placed on the Fair Labor Standards Act of 1938 by the Supreme Court in their findings in Section 1 of the Portal-to-Portal Act. I don't so interpret it. However, it is immaterial here. We boast in this country of our right to criticize; Congress has just as much right to criticize the Courts, the President or anyone else as the people have the right to criticize Congress, and I think we may take cognizance of the fact that it comes in for its share.

The motive and purpose of the "Portal-to-Portal" Act is clearly set forth:

1. To relieve and protect interstate commerce from practices which burden and obstruct it.

2. To protect the right of collective bargaining, and

3. To define and limit the jurisdiction of the Courts.

Since the passage of this law the plaintiffs have made no attempt to amend their complaint to bring themselves within the provision of the "Portal-to-Portal" Act; they have followed one theory only and that is that their rights are contract rights from which necessarily the assumption is made that the rights are property and having acquired these rights prior to the passage of the "Portal-to-Portal" Act such rights cannot be taken away.

█ The Court is of the opinion that the rights here acquired are purely statutory rights and cannot be considered as vested rights even though under the statute as it existed prior to the enactment of the Act of 1947 the employees were entitled to such compensation and it was due them; the only thing remaining to be done was the determination of the amount. To deprive them of this right may under some conditions be an injustice but nevertheless it must be remembered that a contract is an agreement which creates an obligation, its elements are: Parties competent to contract; Mutuality of agreement; Mutuality of obligations. Under the 1938 Act you find none of these elements present. The right of contract does exist under that Act. The employee and the employer were required to accept the statute as written. They were not allowed to compromise their differences. They were not allowed to mutually agree on what compensation they should pay or receive. How can it be said to be anything but a statutory right? Counsel for the plaintiff contends that the statutory right merges into the contract of employment. I think not. The Statute alone fixes the terms of employment. If there is a contract it is not affected by the 1947 Act. Congress did not declare any claims void under existing contract or practices. It did not require the repayment of any money that had been paid the employee. It only legislated with reference to an existing state of affairs and in doing so cancelled certain existing claims that were only enforcible by reason of the Statute. There is nothing in the Act that in

any way prevents the enforcement of any other claim. Congress says:

"(a) No employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended * * * (in any action or proceeding commenced prior to or on or after the date of the enactment of this Act), on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any activity of an employee engaged in prior to the date of the enactment of this Act, except an activity which was compensable by either—

"(1) an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee was employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

"(b) For the purposes of subsection (a) of this section, an activity shall be considered as compensable under such contract provision or such custom or practice only when it was engaged in during the portion of the day with respect to which it was so made compensable.

"(c) In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act of 1938, as amended, of the Walsh-Healy Act, or of the Bacon-Davis Act, in determining the time for which an employer employed an employee there shall be counted all that time, but only that time, during which the employee engaged in activities which were compensable within the meaning of subsections (a) and (b) of this section.

"(d) No court of the United States, of any State, Territory, or possession of the United States, or of the District of Columbia, shall have jurisdiction of any action or proceeding, whether instituted prior to or on or after the date of the enactment of this Act, to enforce liability or impose punishment for or on account of the failure of the employer to pay minimum wages or overtime compensation under the Fair Labor Standards Act of 1938, as amended, under the Walsh-Healy Act, or under the Bacon-Davis Act, to the extent that such action or proceeding seeks to enforce any liability or impose any punishment with respect to an activity which was not compensable under subsections (a) and (b) of this section."

■ Can it be said that Section 2 of the Act is unconstitutional because the claims that it bars are contract claims where Congress has not interfered with any claim that does not rest entirely upon the Fair Labor Standards Act of 1938? I think not, and a careful examination of the authorities presented by counsel on both sides appear to answer the question the same way.

■ The complaint in this action is for activities performed by plaintiffs without any expectation of reward. This is borne out by the fact that they labored without making demand for such pay for approximately eight years. It was an unexpected liability under the statute as far as the employer was concerned, and unexpected on the part of the employee, although the right existed under the statute. Congress decided the law should be changed and proceeded to do so. This was entirely its responsibility. As I have said, Congress had the constitutional authority to enact the original statute of 1938 as a matter of public policy for the purpose of prohibiting and removing conditions in employment which by their nature served, in the judgment of Congress, to impede the flow of goods in interstate commerce. This has been interpreted by the Supreme Court of the United States to include walking time and preliminary activities. Congress has now found that these extraordinary and unexpected claims if allowed to stand will, as a matter of public policy, have a like effect as set forth in their finding in Section 2 of the "Portal-to-Portal" Act, and have attempted to remedy these conditions. In doing so it has benefited some and injured others who are engaged in commerce. These benefits and injuries are the result

of the regulatory measures Congress deemed it necessary to adopt in regulating commerce for the good of all the people. Private individuals' rights must give way to the authority of Congress to legislate in such matters, and such rights that had accrued to the plaintiffs are not vested in the sense that Congress had lost its power to control. The rule is well stated in the case of National Carloading Corporation v. Phoenix-El Paso Express Inc., 142 Tex. 141, 176 S.W.2d 564, 569, certiorari denied 322 U.S. 747, 64 S.Ct. 1156, 88 L.Ed. 1578, as follows:

" * * * the plaintiff does not possess such a vested right as to come within the inhibition of the Fifth Amendment. Such a right must be something more than a mere expectation based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from the demand of another. If, before rights become vested in particular individuals, the convenience of the State induces amendment or repeal of the laws upon which they are based, these individuals are left without any remedy at law to enforce their claims; and if final relief has not been granted before the repeal goes into effect it cannot be granted thereafter, even if a judgment has been entered and the cause is pending upon appeal. The general rule is that when such law is repealed without a saving clause, it is considered, except as to transactions past and closed, as though it had never existed."

Many times Congress has voided claims that originate by statute. This was done in the cases of United States ex rel. Roderiguez v. Weekly Publications, Inc., 2 Cir., 1944, 144 F.2d 186 and Sherr v. Anaconda Wire & Cable Co., 2 Cir., 149 F.2d 680, 681, in which certiorari was denied, 326 U.S. 762, 66 S.Ct. 143, 90 L.Ed. 458. In the last cited case the Court said:

"Here, there being no room for interpretation, the bare question before us is whether the act is unconstitutional as a violation of the Fifth Amendment. The argument is that § 232, as it stood when the plaintiff brought the action, was an offer, of which the mere filing of the complaint was an acceptance, and that the contract so arising was 'property', which 'vested' in the plaintiff, and which the Constitution put it beyond the power of Congress to divest. We by no means agree that the contract—if there was one, which in turn we do not say that there was—created the kind of property which the Fifth Amendment protects. (certainly when, as here, the informer had done nothing more than file the complaint); but we shall for argument assume that there was a contract and that it was protected by the Constitution. Even so, subdivision (c) was constitutional in putting an end to the jurisdiction of the district court." .

■ Also a statement in Overnight Motor Transport Co. v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 1220, 86 L.Ed. 1682, announces the rule that, "If overtime pay may have this effect (of removing burdens) upon commerce, private contracts made before or after the passage of legislation regulating overtime cannot take the overtime transactions 'from the reach of dominant constitutional power.'" It made no difference whether Congress abrogated the private rights of the employer or the employee. If Commerce was burdened by the law giving these rights, Congress is given the power under the commerce clause to enact such legislation it finds helpful to commerce or to remove any barrier that obstructs it.

"Commerce is the important subject of consideration, and anything which directly obstructs and thus regulates that commerce which is carried on among the states, whether it is state legislation or private contracts between individuals or corporations, should be subject to the power of Congress in the regulation of that commerce.

"The power of Congress over this subject seems to us much more important and necessary than the liberty of the citizen to enter into contracts of the nature above mentioned, free from the control of Congress, because the direct results of such contracts might be the regulation of commerce among the states, possibly quite as effectu-

ally as if a state had passed a statute of like tenor as the contract.

"The liberty of contract in such case would be nothing more than the liberty of doing that which would result in the regulation, to some extent, of a subject which, from its general and great importance, has been granted to Congress as the proper representative of the nation at large." Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 20 S.Ct. 96, 103, 44 L.Ed. 136.

 There is nothing offensive to the Fifth or the Fourteenth amendments of the Constitution in this statement of the law. The Constitution in the commerce clause, art. 1, § 8, cl. 3, vests in Congress power to eliminate any rights it has heretofore created. Counsel for the plaintiff does not dispute the power of Congress to regulate Interstate Commerce in the interest of the public welfare but claims that such action is restricted by the Fifth amendment which prohibits "taking of property without due process of law." I have carefully examined the authorities presented by plaintiff on this question. These cases only go to the general rule. The case of Continental Bank v. Rock Island R. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110, relied on by the plaintiffs does not support their position. The Court says in that opinion at page 680 of 294 U.S. at page 608 of 55 S.Ct.:

"The Constitution, as it many times has been pointed out, does not in terms prohibit Congress from impairing the obligation of contracts as it does the states. But as far back as Calder v. Bull, 3 Dall. 386, 388, 1 L.Ed. 648, it was said that among other acts which Congress could not pass without exceeding its authority was 'a law that destroys or impairs the lawful private contracts of citizens.' The broad reach of that statement has been restricted (Legal Tender Cases, 12 Wall. 457, 549, 550, 20 L.Ed. 287); but the principle which it includes has never been repudiated, although the extent to which it may be carried has not been definitely fixed. *Speaking generally, it may be said that Congress, while without power to impair the obligation of contracts by laws acting directly and independently to that end, undeniably, has authority to pass legislation pertinent to any of the pow-*ers conferred by the Constitution however it may operate collaterally or incidentally to impair or destroy the obligation of private contracts."

While in this case the Court lays down the general rule, the part of that statement which I have italicized above indicates how far the power of Congress extends, even when a private contract is involved there are times when such rights must yield to paramount legislative power and the power of Congress over Interstate Commerce has no limitations other than as prescribed in the Constitution, and there is no constitutional inhibition, but it is expressly given the power to regulate commerce and to enact all legislation necessary for "its protection and advancement." There are no contract rights involved in the cases here being considered. Still if the contention of the plaintiff is followed and it can be said that the rights here are contract rights in a limited sense Congress nevertheless is not prohibited from exercising its power to protect commerce. The Supreme Court of the United States in the case of Norman v. Baltimore & O. R. Co., 294 U.S. 240, 55 S.Ct. 407, 416, 79 L.Ed. 885, 95 A.L.R. 1352, said:

"Contracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."

Here we find the power of Congress fully set forth in the commerce clause and it is so all embracive that it may go so far in cases where the National interest requires it, to impair or destroy pre-existing property rights.

"This broad commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy. Rather it is an affirmative power commensurate with the national needs. It is unrestricted by contrary state laws or private contracts and

in using this great power, Congress is not bound by technical legal conceptions. Commerce itself is an intensely practical matter. Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518. To deal with it effectively, Congress must be able to act in terms of economic and financial realities. The commerce clause gives it authority so to act." North American Co. v. Securities and Exchange Commission, 327 U.S. 686, 66 S.Ct. 785, 796, 90 L.Ed. 945.

Before Congress enacted the "Portal-to-Portal" Act of 1947 the congressional record shows long hours of hearing and the findings included in the bill itself shows that they were made after exhaustive study. It was fully advised of the nearly six billion dollars in claims that were pending at that time; it was aware that with the passage of this Act these claims would be abrogated; it decided that the interest of the public outweighed the interest of the individual and it acted to prevent the threatened injury, not only to commerce but to the National economy as well. There is no necessity here to discuss the general rule that retroactive meaning will not be given a statute unless specifically provided, for here it is clear that Congress intended to make it retroactive and did so with words that are so plain that there is no question that the claims as set forth in plaintiffs' complaint in this action are not only outlawed, but Congress has denied the Federal Court jurisdiction to enforce them, no doubt however if it was not within the power of Congress to destroy the right, then it would not be within its power to destroy the remedy. However, I am not called upon to pass on that question as the main question here is, did Congress have the constitutional power to relieve commerce from the burden placed upon it by the Fair Labor Standards Act of 1938 and in doing so make it retroactive. This has been well answered in the case of Addyston Pipe & Steel Co. v. United States, supra. Congress would be helpless to relieve commerce of the statutory burden created by the Fair Labor Standards Act of 1938 if it was not permitted to correct its mistake in the interest of the public welfare by an Act that would apply retroactively and relieve commerce of the burden that had inadvertently been placed upon it. I say inadvertently because it appears that Congress did not understand that it had included the walking time and the other preliminary activities in the 1938 Act until the decision of the Supreme Court in the case of Anderson v. Mount Clemens Pottery Co., supra.

"The power of Congress, in its regulation of interstate commerce * * * was not fettered by the necessity of maintaining existing arrangements and stipulations which would conflict with the execution of its policy. To subordinate the exercise of the Federal authority to the continuing operation of previous contracts would be to place, to this extent, the regulations of interstate commerce in the hands of private individuals, and to withdraw from the control of Congress so much of the field as they might choose, by prophetic discernment, to bring within the range of their agreements. The Constitution recognizes no such limitation." Philadelphia B. & W. R. Co. v. Schubert, 224 U.S. 603, 32 S.Ct. 589, 592, 56 L.Ed. 911.

The only limitation upon Congress is that in enacting laws pursuant to its constitutional power it shall not be unreasonable, arbitrary or capricious and that the means selected shall have a real and substantial relation to the object sought to be attained.

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government. Touching the matters committed to it by the Constitution the United States possesses the power, as do the states in their sovereign capacity touching all subjects jurisdiction of which is not surrendered to the federal government, as shown by the quotations above given. These correlative rights, that of the citizen to exercise exclusive dominion over property and freely to contract about his affairs, and that of the state to regulate the use of property and the conduct of business, are always in collision. No exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will

not to some extent abridge his liberty or affect his property. But subject only to constitutional restraint the private right must yield to the public need.

"The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469.

"Due process of law in each particular case means such exercise of the powers of government as the settled maxims of the law permit and sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs. Private rights may be interfered with by either the legislative, executive, or judicial department of government. The executive department in every instance must show authority of law for its action, and a case does not often arise for an examination of the limitations which circumscribe its powers. The legislative department may in some cases constitutionally authorize interference, and in others may interpose by direct action.

"But if it is a right which rests upon equities, it has its reasonable limitations and restrictions. It must have regard to the general welfare and public policy, which cannot be a right which is to be examined, settled, and defended on a distinct and separate consideration of the individual case, but rather on broad and general grounds which embrace the welfare of the whole community, and which sanction the equal and impartial protection of the interests of all.

" * * * What is a vested right in the constitutional sense? * * * in organized society every man holds all he possesses, and looks forward to all he hopes for through the aid and under the protection of the laws, but as changes of circumstances and of public opinion, as well as other reasons affecting the public policy, are all the while calling for changes in the laws, and these changes must influence more or less, the values and stability of private possessions, and strengthen or destroy well founded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations cannot be regarded as vested rights in any legal sense." Judge Cooley in his work on Constitutional limitations.

It is plain that the rights which accrued to the plaintiffs in this action were merely incidental to the purpose of the statute and did not become vested nor irrevocable, but were at all times subject to modification or abrogation by Congress acting in pursuance of the same Constitutional authority under which the 1938 statute was enacted, and that the commerce clause of the Constitution vests in Congress power broad enough to eliminate the rights created by that Act even if such rights were assumed to be vested in character.

■ The complaint does not state a claim against the defendants upon which relief can be granted and plaintiffs have not attempted to bring themselves within the Statute, claiming their rights under the law as it existed prior to the passage of the "Portal-to-Portal" Act, relying solely on the unconstitutionality of that Act. Not having brought themselves within the 1947 Act, this action must be dismissed for failure to state a claim on which relief can be granted.

■ It is not necessary to say anything about the provisions of the statute defining and limiting the jurisdiction of the Court. It is so well settled that Congress has the power to regulate the jurisdiction of all inferior Courts of the United States. It may confer jurisdiction and may thereafter limit or withdraw jurisdiction in whole or in part with prospective or retrospective effect

(when as in this case, the statute in other respects is constitutional).

The "Portal-to-Portal" Act was in no way an interference by Congress with the functions of the judicial branch of the Government. It did not attempt to interfere with the interpretation placed upon it by the Court. It accepted that interpretation and merely corrected the law. Congress alone had the power to do this. It represents the people; it has at heart the welfare of the nation at large and it is answerable only to the will of the people and let me repeat that it is a fundamental principle of statutory construction that whenever reasonably possible Courts must construe statutes so as to uphold their constitutionality.

"The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same." National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352.

The "Portal-to-Portal" Act of 1947 is Constitutional and the motion to dismiss will be sustained on the grounds that the complaint fails to state a claim upon which relief can be granted. That the jurisdiction of the Court fails to appear from the complaint on file herein.

After reading the complaint and hearing argument of counsel I take it that it will be impossible to amend the complaint by stating facts which give this Court jurisdiction, however, plaintiffs may feel they can amend to bring themselves within the Statute and thirty days will be allowed to amend, failing which, final judgment of dismissal will be entered.

Necessary Orders will be prepared by counsel for the defendants in each of the 28 cases to conform with the foregoing opinion.